No. 82-476

IN THE SUPRMEE COURT OF THE STATE OF MONTANA

1983

---

BERNARD JAMES FITZPATRICK,

       Petitioner and Appellant,

  -vs-

STATE OF MONTANA,

       Respondent and Respondent.

---

APPEAL FROM: District Court of the Thirteenth Judicial District,
In and for the County of Big Horn,
The Honorable Charles Luedke, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Stephens & Cole; Robert L. Stephens, Jr. argued,
        Billings, Montana
        Timothy K. Ford, Seattle, Washington

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
        John Maynard, Asst. Atty. General, argued, Helena
        James Seykora, County Attorney, argued, Hardin, Montana

---

Submitted: June 2, 1983

Decided: October 6, 1983

Filed: OCT 6 - 1983

*Ethel M. Harrison*

---
Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

Petitioner, Bernard J. Fitzpatrick, appeals an order of the District Court of the Thirteenth Judicial District of the State of Montana dismissing petitioner's amended petition for post-conviction relief.

In October 1975, petitioner Bernard J. Fitzpatrick and four others, Gary Radi, Travis Holliday, Paul Bad Horse and Edwin Bushman were tried by a jury on the charges of deliberate homicide, aggravated kidnapping, and robbery of Monte Dyckman, a Hardin Safeway supermarket clerk. Petitioner was found guilty on all counts and was sentenced to death. On appeal, this Court reversed the convictions of all the defendants and on October 19, 1977, remanded the cases for separate retrials. State v. Fitzpatrick (1977), 174 Mont. 174, 569 P.2d 383. The question of effective assistance of counsel was an issue on this first appeal. Fitzpatrick, 569 P.2d at 389.

On November 29, 1977, attorney John L. Adams, Jr., was appointed by the District Court to represent petitioner at his retrial. In December 1977, both the State and petitioner filed motions asking the District Court to appoint counsel other than Adams, who had represented codefendant Paul Bad Horse in the first trial, or to have a hearing to see if Fitzpatrick was satisfied with Adams as counsel. Petitioner's motions were filed pro se. A hearing was held on January 16, 1978, at which time Fitzpatrick withdrew his request, stating that he wished to keep Adams as his counsel.

At his second trial in 1978, Fitzpatrick was again convicted of deliberate homicide, aggravated kidnapping, and

-2-

robbery. He was again sentenced to death. During that second trial, his sentencing hearing and the subsequent appeal, he was represented by John L. Adams, Jr. This Court, after hearing oral argument on two separate occasions, affirmed his conviction. The United States Supreme Court twice denied certiorari. Fitzpatrick v. Montana (1980), 449 U.S. 891, and Fitzpatrick v. Sentence Review Division (1980), 449 U.S. 891.

Fitzpatrick then filed a petition for post-conviction relief in Big Horn County. The District Court dismissed all claims in that petition but reserved ruling on his claim No. 8(c), which charged ineffective assistance of counsel. The District Court denied petitioner's motion for reconsideration or amendment. Fitzpatrick then appealed the denial of the petition for post-conviction relief. This Court affirmed dismissal of the other claims and remanded the cause to the District Court for an evidentiary hearing solely on the issue of ineffective assistance of counsel. Fitzpatrick v. State (1981), _____ Mont. _____, 638 P.2d 1002, 38 St.Rep. 1448. A five-day hearing was held in April 1982. On September 1, 1982, the District Court issued an order and memorandum dismissing that claim. Fitzpatrick now appeals.

Post-Conviction Relief:

Because the post-conviction procedure is a civil remedy, the failure to present claims in earlier proceedings will not bar them from presentation at this time. Nevertheless, the fact that an issue is not raised at a pretrial hearing, during trial or on direct appeal will be considered by this Court as an element bearing on the merits of that particular claim.

The language of the statute providing for post-conviction relief is clear. Section 46-21-101, MCA. Circumstances in which validity of a sentence may be challenged, presents a two-part test which a petitioner must meet in order to qualify for such relief. The statute reads:

> "A person adjudged guilty of an offense in a court of record who has no adequate remedy of appeal and who claims that sentence was imposed in violation of the constitution or the laws of this state or the constitution of the United States, that the court was without jurisdiction to impose the sentence, or that the sentence was in excess of the maximum authorized by law or is otherwise subject to collateral attack upon any ground of alleged error available under a writ of habeas corpus, writ of coram nobis, or other common law or statutory remedy may petition the court which imposed the sentence or the supreme court to vacate, set aside, or correct the sentence." (Emphasis added.)

The first element of the test which a petitioner must satisfy is that petitioner be "adjudged guilty of an offense in a court of record who has no adequate remedy of appeal . . ." This phrase does not mean that a petitioner may avail him or herself of the appellate review process, and, when the results are unfavorable, utilize the post-conviction review procedure to, in effect, file numerous and successive "appeals." The language of the statute for part one of the test clearly intends this form of relief to be available to convicted persons who have not had their sentences reviewed by the appellate court. It is clearly an abuse of the relief procedure to withhold issues which could and should have properly been raised on appeal, or to manufacture issues years later, in an attempt to manipulate and obstruct the criminal justice process.

Such abuse of the statute is particularly apparent in

-4-

this case where the petitioner has had such extensive experience in the criminal justice system. Clearly, the statute was intended to prevent the miscarriage of justice, not to provide an opportunity to manipulate and obstruct justice. As the United States Supreme Court so succinctly stated in a recent opinion, "when the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction and sentence." Barefoot v. Estelle (1983), ___ U.S. ___, ___ S.Ct. ___, ___ L.Ed.2d ___, 51 L.W. 5189 (No. 82-6080, decided July 6, 1983). The Court further quoted from Lambert v. BARRETT (1895), 159 U.S. 660, as follows: "It is natural that counsel for the condemned in a capital case should lay hold of every ground which, in their judgment, might tend to the advantage of their client, but the administration of justice ought not to be interfered with on mere pretexts." We agree. And we cannot further allow the abuse of the post-conviction relief statute to obstruct the course of justice.

The sole issue in this PROCEEDING is whether petitioner was denied effective assistance of counsel during his retrial on the charges of deliberate homicide, aggravated kidnapping and robbery.

Petitioner's amended petition alleges ineffective assistance of counsel in numerous particulars. We will discuss these allegations item by item.

Petitioner alleged that Adams did not consult with petitioner regarding his case until January 7, 1978, and did not have time to adequately prepare the case.

In December, 1977, petitioner asked that other counsel be appointed to represent him because he felt that John L.

Hon. Frank I. Haswell
Chief Justice, Supreme Court
Room 414 Justice Building
215 North Sanders
Helena, Montana 59620

CORRECTION. In preparing this opinion for publication, we noted in our verification of titles and citations the matters listed below. Corrections have been made on our copy of the opinion.

Date:
        November 7, 1983
Re:
        Fitzpatrick v. State, No. 82-476, Oct. 6, 1983

Page 5, line 11 -- Lambert v. <u>Jackson</u> should read Lambert v. <u>Barrett</u>.

WEST PUBLISHING COMPANY
Box 3526
St. Paul, MN 55165

Adams, Jr., did not have sufficient time to represent him in his retrial. In response, the prosecution also requested that a hearing be held and that it be determined that petitioner be satisfied with his counsel, not only as to the time such counsel could devote to the matter, but also in view of the fact that such counsel had represented another defendant in the first trial.

A hearing was held with the following result:

"THE COURT: Court will be in session. We have Big Horn County Criminal Cause No. 1107-C, entitled State of Montana versus Bernard James Fitzpatrick. Mr. Fitzpatrick, you have filed with this Court a request that the Court consider replacing Mr. John Adams as your attorney on the ground that he, being a public defender, has so much to do that he is not able to adequately take care of your case. You have likewise filed a similar request with the Montana Supreme Court and they have responded to you, and to me as well, and then, similarly, the County Attorney of Big Horn County has likewise filed a motion requesting that you be given the opportunity to express yourself on this very point. And so that is why we are convened here this afternoon, Mr. Fitzpatrick. Do you have any statement that you'd like to make to the Court at this time?

"THE DEFENDANT: Yes I do. I filed a motion with this Court and with the Supreme Court that Mr. John Adams was a public defender and did have a heavy caseload and that, but since that filing I have had a talk with Mr. Adams and Mr. Adams is working on my case, and working hard, and I am satisfied with the work and I do feel that -- He assures me that his case load isn't too heavy to handle this case, and I'm inclined to believe that it isn't, and I would like to withdraw whatever it is on that, keep Mr. Adams.

"THE COURT: All right, I want to explain to you, the reason I appointed Mr. Adams is because No. 1, he has been in this Court a good many years and I know he is completely competent; No. 2, he has already been through this case once and

-6-

> so he's familiar with all the details so
> he can be of more help to you quicker and
> easier than anybody else I could find."

Following retrial and sentencing, petitioner wrote to Adams expressing his displeasure with Adams' representation of him. He later wrote Adams advising that a lot of what he had said was not true and that "you are a very competent lawyer and you were more than competent at my trial."

At the evidentiary hearing, petitioner advised that the reason he recanted was only to keep his counsel on the case during its appeal to the Montana Supreme Court. Following the decision of the Montana Supreme Court which was unfavorable to the petitioner, he again returned to his accusations of incompetency.

To put these accusations in the proper perspective, it is crucial to understand that petitioner is comparing the final result of his retrial to that of the result of the second trial of defendant Radi which preceded petitioner's trial by several weeks. Defendant Radi was acquitted on all counts.

The thrust of petitioner's argument is two-fold: first, that evidentiary material which was presented on behalf of Radi was not used in petitioner's retrial; second, that defense counsel did not call certain specified witnesses additional to those used by Radi, which petitioner listed for his counsel as being able to support his alibi defense.

As to the Radi trial evidence, it is apparent that petitioner believes it should have been identically presented in his retrial, without regard to other considerations. Since petitioner contends he was with Radi, and

-7-

since Radi was acquitted, petitioner believes he should have been acquitted also. Petitioner also obviously believes, regardless of other factors, that the use of additional witnesses which were not called at his retrial would have resulted in his acquittal. Since Radi was acquitted and shortly thereafter petitioner was convicted, petitioner concludes that the cause of his conviction was an inadequacy on the part of his defense counsel.

Petitioner conveniently overlooks the fact that the key witnesses in the prosecution's case at the Radi trial failed to appear and testify in person and consequently, the prosecution was forced to rely upon evidence offered by casual observers who had knowledge of various aspects of the events. The key witnesses were available for Fitzpatrick's retrial and this circumstance alone is more than adequate to explain the differing results of the two trials.

The allegations with regard to petitioner's contention that additional witnesses should have been called will be discussed witness by witness.

Dennis Sasich: Petitioner's amended petition states that Sasich "could have testified that he saw Radi at the Squire Lounge in Billings on the evening of April 4th or 5th, 1975, and that he saw petitioner in that same place with Radi around the same time." At Radi's trial, this witness could not conclusively state that Radi was in the Squire Lounge on April 5th. At the evidentiary hearing held on Fitzpatrick's amended petition, Sasich appeared and testified in effect that he had never seen petitioner before.

The witnesses used by counsel on behalf of petitioner

at retrial were two cocktail waitresses from the Squire Lounge, Shirley Graham and Gloria LeVe. Graham testified that petitioner's female companion, Christine Fetters, was seen by her in the Squire Lounge on the night of April 5 and that petitioner could have been with her although Graham did not specifically recall seeing him. LeVe's testimony placed both Fetters and petitioner together in the Squire Lounge at that time. Obviously, the witnesses selected by counsel to testify on behalf of petitioner were much stronger than a witness who did not even know petitioner.

Barbara Hansen (Radi): Petitioner's amended petition states that this witness and Radi were "with Fitzpatrick at several points during that afternoon and evening in bars in Billings . . ."

Her testimony at the Radi trial as to the events of April 5 was not confirmed by another member of the party, Shelley Beaumont, who was also called as a witness.

At the evidentiary hearing, Ms. Radi augmented her testimony and further modified it on cross-examination. She further stated that while she is friendly to petitioner now, in 1978 he was a stranger to her and she did not want to be a witness for him or be involved in his trial in any way. By the time of petitioner's trial she had left Montana, and the investigator assisting Fitzpatrick's counsel determined that she was somewhere in Idaho but was unable to contact her. She had a pattern of using different names at different times and the search was discontinued.

It appears from the testimony of this witness in the Radi trial that on the night in question she had used marijuana, LSD and alcohol and was, in her own words, "a mess."

-9-

At the time of the homicide she was a prostitute working in Nevada but home on vacation living with Radi in a "hustler" relationship.

Defense counsel had listened to some of her testimony in the Radi trial and had observed her demeanor on the stand. He judged her effect upon the jury as being detrimental and was not impressed with her credibility.

Given the totality of the atmosphere which accompanied the appearance of this witness, it cannot be said that it was an exercise in incompetency to have doubts about her predictability and veracity, particularly if she were to be an unwilling witness.

Herschel Wilson: Petitioner alleged in his amended petition that this witness could have testified that the petitioner was in Billings on the evening of April 5.

This witness did not testify at the Radi trial and was intoxicated at the evidentiary hearing. He could only testify that he saw petitioner in the Standard Bar with a girl from Butte shortly after petitioner was released from prison. This witness could not and did not testify that petitioner was in Billings at the time the crime occurred in Hardin. It clearly cannot have been a lack of competency to have failed to call this witness.

Cheryl Wilson (originally alleged as "Jackie Wilson"): In his amended petition Fitzpatrick states that this witness could have testified that petitioner was in the Standard Bar on April 5, 1975.

This witness did not testify at the Radi trial but did appear at the evidentiary hearing. Her testimony was that she had never seen petitioner prior to the evidentiary

-10-

hearing. She testified that she and Herschel Wilson had been involved in a five-day drinking party at about the time of the homicide in 1975.

Edna Torske: In his amended petition, Fitzpatrick alleged that Torske could place him in the Standard Bar on the night of April 5 because of a fight which had occurred and which she had discussed with him.

Torske did not testify at the Radi trial but did appear at the evidentiary hearing. She testified that she did see petitioner at the Standard Bar two or three times after he got out of prison but did not know whether it was during the day or night, on a week day or weekend, but at any rate could not have been later than 9:00 p.m. because that is when she got off work.

She had been contacted even before the 1975 joint trial and, at first, was encouraging to the defense in what she would say. Shortly thereafter, however, she concluded that she had been mistaken in her memory and stated that she wanted to be left alone. She was uncooperative with everyone and, at the time of the 1978 trial, refused to testify voluntarily when contacted by defense counsel. She told counsel that she could not remember and also stated that the fight she does remember did not occur on the day of the murder. She felt that petitioner was trying to use her improperly. Defense counsel decided that she would be unable to support the alibi defense and consequently did not call her. It is not an act of incompetency to refuse to call an unfavorable witness. In addition, it developed at the evidentiary hearing that, by petitioner's own admission, the fight in question was on April 4, not April 5, and this was

-11-

confirmed by a complaint and report from Billings Police Department records. Clearly, Torske was justified in refusing to verify petitioner's allegations and Adams was justified in declining to call this witness.

Don Collett and Laurel Collett: Petitioner alleges in his amended petition that these two parties could place him in Billings on April 5, 1975.

Neither of these witnesses testified at the Radi trial. Don Collett did appear at the evidentiary hearing but was intoxicated and left the courtroom before he could be called as a witness. He could not be found after he left so his testimony was not taken. However, the paralegal that spoke to him in preparation for the hearing advised that Mr. Collett's recollection was even worse than that of Herschel Wilson.

Laurel Collett's testimony was taken by deposition while she was hospitalized. She testified that she saw petitioner with Radi in the Standard Bar at some time between 6:00 p.m. and 2:00 a.m. for a brief period of time on the night of the murder.

Harriet Torgerson: The amended petition states that this witness could testify that petitioner checked into the Ponderosa Inn Motel before 2:00 or 3:00 a.m. on April 5, 1975.

This witness did not appear at the Radi trial. At the evidentiary hearing, she testified that she checked petitioner in "towards morning." She could not be more specific regarding the exact time, except that she was certain it would have been later than 3:00 a.m. and could have been as late as 5:00 or 6:00 a.m. with the room receipt still dated

-12-

April 5, 1975. It was her practice that the date change was not made until after she had checked the books for the previous day. This witness's testimony supports the prosecution's case rather than contradicts it as alleged in petitioner's amended petition. It can hardly be ineffective assistance for counsel to decline to call a witness which he knew would support the prosecution.

Christine Fetters: Petitioner contends that this witness's testimony was impeachable in a number of ways. Petitioner alleged that Fetters' children had been taken from her and she was being threatened with being deprived of their custody by the State. For this reason, she testified, according to petitioner, for the State. Fetters denied this at the evidentiary hearing, and petitioner did not offer any evidence in support of this allegation.

Fetters' evidence regarding burial of the gun was also impeachable according to petitioner. However, at the evidentiary hearing, her testimony was confirmed.

Her trial testimony regarding the financial position of petitioner and herself also was not impeached at the hearing. Petitioner alleged that a witness named Robert Miller could testify that he loaned petitioner a sum of money. Robert Miller could not be located either for the trial or the hearing, and it was noted that "Robert Miller" was a pseudonym sometimes used by petitioner.

Witnesses were presented on Fitzpatrick's behalf at the trial to testify to his financial condition. Petitioner himself testified that he made money through the sale of drugs shortly after his release from prison.

At the hearing, Fetters did amend her testimony

somewhat as to the date she heard the radio announcements of the Dyckman murder.

Petitioner characterized Fetters as a "surprise" witness. In actuality, she had been listed by petitioner before the trial as one of his alibi defense witnesses. As trial approached, however, both defense counsel and the investigator ascertained that she would be an undesirable witness and that her testimony would not be favorable to petitioner.

At the 1978 trial when the State sought to call Fetters as a prosecution witness, defense counsel objected on the basis that she was a defense witness and could have been in a common-law marriage relationship with petitioner.

In summary, the evidence does not support petitioner's allegations that the testimony of Fetters was readily impeachable.

Iva Lee Finch and Cindy Lee Morgan: Petitioner alleges that defense counsel failed to adequately bring out the effect of LSD upon these witnesses. However, the trial transcript demonstrates that this area was adequately covered.

Robyn Vandersloot Spaulding: Petitioner alleges that this witness could have testified as to the hair colors and styles of the two individuals she observed with Dyckman. At the evidentiary hearing, she testified that she could describe neither the styles nor the colors but that neither of the individuals with Dyckman were Fred or Raleigh Kraft, two men at whom petitioner was attempting to cast suspicion.

Kenny Elms and Jim Doane: Petitioner alleges that these witnesses could have testified regarding the car seen

following the Dyckman vehicle. This evidence was covered by three other witnesses and would only have been repetitive. Further, the automobile identification testimony was emphasized in cross-examination of Sheriff Brown and Lyle Doane and in the Ronald Potts testimony.

Art Mulkey: The prosecution contended that the car seen following the Dyckman vehicle was Radi's. Radi's car was a 1971 Pontiac with single headlights, a vertical configuration in the grill area and oblong taillights. The total effect of the testimony elicited by Fitzpatrick's counsel at trial, through the witnesses Effie and Everett Knows the Ground and Monte Doane, was that in the car they saw following the victim's car the headlights were dual (Doane) and the taillights were round (Everett). Consequently, the testimony developed at the trial regarding the car following the Dyckman vehicle was to Fitzpatrick's benefit. Mulkey's testimony, if he had agreed to return from Georgia and testify as to the differences in appearance between Radi's car and the car described by Doane and Everett and Effie Knows the Ground, would simply have reiterated other testimony.

Edwin Bushman: Petitioner alleges that the testimony of this key prosecution witness could have been impeached regarding where the victim was depositing the Safeway receipts. This allegedly could have been accomplished by calling Everett Stoltz. In fact, Stoltz did testify and that point was covered both on direct and cross-examination.

Petitioner also contends that suspicion could have been directed at Bushman if Larry Cole, the defense investigator, had been called to testify regarding the time it took

to drive from the Post Office to Toluca and back to the Post Office. This point was brought directly to the attention of the jury in defense counsel's presentation of Sheriff Brown's testimony.

Raleigh Kraft: Petitioner alleges that this witness's testimony could have been impeached as to when he learned of the murder. It is clear that petitioner misread the Fred Kraft statement by interpreting it to mean that Fred Kraft had not heard of the crime prior to the discussion with Bushman.

Ronald Potts: Petitioner alleges that defense counsel failed to bring out prior inconsistent statements of this witness with regard to the car he saw parked in front of Safeway. Defense counsel questioned this witness on both direct and cross-examination, and the questioning covered this point, among others.

Irene Girard and Barbara Howell: Petitioner alleges that these two witnesses should have been called to verify that they had sent him money. The depositions of these witnesses were taken for presentation at the evidentiary hearing, and they testified that Girard had sent $50 and Howell $20 in May or June, 1975.

Petitioner alleges that certain records could have been presented regarding the issues.

The minimum amounts sent by Girard and Howell are not significant in terms of the total financial picture. Also, these items were not at issue as Christine Fetters had already testified as to their receipt.

With regard to the Snelling & Snelling employment records, the record demonstrates that there was never any

issue that petitioner applied for work through this agency.

Ken Greene: Petitioner alleges that Greene, an attorney working with the Defender Project at the Montana State Prison, could have testified that he had advised Fitzpatrick shortly before Fitzpatrick's release from prison that if Fitzpatrick did not leave the state he would be constantly picked up as a suspect and charged with crimes committed where Fitzpatrick resided. Petitioner contends that this testimony could have countered any prosecution claim that petitioner's departure circumstantially indicated guilt. Defense counsel considered this testimony irrelevant as the record shows that petitioner stayed in Butte and also repeatedly made trips to Billings after the murder. If defense counsel had presented this testimony, it would have been apparent that petitioner had not left the state for any significant period of time after release from prison.

Larry Cole: Petitioner alleges that defense counsel erred in not calling this witness, the defense investigator, regarding the chain of custody of the Radi vehicle. Cole and defense counsel discussed the possibility of Cole testifying and decided against it. Petitioner's defense was alibi, so there was a question of relevancy with respect to matters concerning the Radi vehicle. If petitioner were not in Hardin the night of the crime, which was petitioner's defense, the contents of the Radi vehicle weeks later would be immaterial to him.

Robert McRae: Petitioner maintains that this witness should have been called to testify regarding a shell casing found in the Radi vehicle. Cole contacted McRae and discussed his testimony. It was decided not to have McRae

testify as his testimony would not be germane to the alibi defense.

Forensic Evidence from the Murder Scene: Petitioner alleges that negative results of tests should have been presented. The transcript shows that such evidence was covered in the cross-examinations of Sheriff Brown and Carl Zarndt, an FBI agent.

Further Evidence: Petitioner alleges in his amended petition that there was further evidence, presumably favorable to petitioner, which defense counsel failed to present. No such further evidence was presented to the court at the evidentiary hearing.

Insufficient Defense Legal Research: These generalized allegations have, for the most part, already been discussed and ruled upon in the District Court's prior order dismissing Fitzpatrick's petition, which order has been affirmed by the Montana Supreme Court.

Insufficient Trial Preparation: This contention was discussed in the findings of fact and conclusions of law previously issued on January 7, 1981, in which, at page 20, the District Court stated:

> "At the outset, petitioner attempts to show that there was insufficient defense preparation at, and prior to trial. Omitted from the 'facts' is recognition that defense counsel had served as counsel for a codefendant in the first trial of this cause and already had detailed familiarity with the case, so that there is no significance to be presumed from the facts alone surrounding the date of his appointment to serve this petitioner, or the date upon which inception of consultation with the petitioner commenced. The facts which petitioner relies upon to support his claim of insufficient defense preparation are merely conclusory allegations and, as such, are insufficient."

-18-

The only item of evidence offered in this connection at the evidentiary hearing was Exhibit AF, purporting to show that defense counsel, during December 1977 and January and February 1978, was burdened with a total of forty-seven pending criminal cases. The point is that, being so burdened, he was unable to properly prepare for petitioner's trial.

Exhibit AF is a classic example of how a case load listing, by itself, can be deceptive and misleading. As examples, Case No. 10259 was actually closed as to Adams in May 1977 and was still alive in December 1977 only because of the existence of a codefendant represented by other counsel. The same is true of Case 10332. Case 10449 was closed on December 1, 1977. Case 10461 was dismissed December 5, 1977. Case 10491 was completed December 5, 1977, and 14089 was completed on December 19, 1977. Adams withdrew from 10460 on January 11, 1978, and a guilty plea in 10478 occurred on that same date. Case 10500 was dismissed December 5, 1977, and 10521 was closed on December 1, 1977. Cases 10577 and DC-78-002 were both closed on January 9, 1978. None of these cases involved trial time or trial preparation and the Freeman murder case, which petitioner mentioned in his testimony, did not go to trial until April 1978. Case 10568, shown as an active case in December 1977 and January 1978, is one in which Adams was not appointed counsel until March 22, 1978, which was after petitioner's trial.

An examination of the records will further show that under the pace of court calendaring, the cases filed subsequent to No. 10557 in which a contest developed would

not mature until in April or May 1978, or later. Those which would close earlier would be by way of guilty pleas.

It should also be recalled at this point that defense counsel's case load was a primary issue at the hearing which petitioner requested prior to his second trial. At this hearing on the petition which requested appointment of other counsel, petitioner withdrew his objection to his court-appointed counsel and stated that he thought Adams could handle his case effectively.

It follows that Exhibit AF falls short in its probative effect on the point urged by petitioner.

Sentencing:

Petitioner alleges in his amended petition that defense counsel presented no evidence in mitigation, although such mitigating evidence was allegedly available through his mother, his doctor and hospital records.

At the evidentiary hearing, there was no evidence presented as to any doctor or hospital records relating to treatment of petitioner for dizzy spells and headaches. Petitioner's mother, Irene Girard, whose testimony was taken by deposition, did advise of dizzy spells suffered by petitioner as a child, resulting in his ears being lanced. However, because of a family break-up, her contact with petitioner was very spotty over the years. She left when he was seven years old and she saw him for a period when he was fifteen, again when he was seventeen, and finally on a brief visit when he was twenty-two or twenty-three years old. She had not seen him since, although petitioner did advise his mother in a telephone conversation at a time when he was confined in the Montana State Prison that he was still

-20-

having dizzy spells, but the records of the prison made no mention of that fact or of any history of headaches.

At the evidentiary hearing, Chris Fetters recalled that petitioner had told her that he had lied and attempted to use headaches and dizzy spells in the past to excuse his conduct. It is not made clear by petitioner what the relevancy might be with respect to dizzy spells and headaches in connection with the sentencing process. No specificity is provided as to how it could enter into sentencing as a mitigating factor provided by the statutes.

In connection with the deposition of Irene Girard, respondent's exhibit A was attached and discussed as a part thereof. It consists of a questionnaire submitted by the Montana State Prison Reception Unit to Mrs. Girard, seeking background information in connection with petitioner's reception at some time into the state prison. To it is attached a letter written by Mrs. Girard, which outlines the developmental history of petitioner. It mentions petitioner being expelled from school, his membership in a school gang, car thefts, juvenile commitments, attempted escape, A.W.O.L. from the Army on two occasions, acquittal upon a charge of killing a man with his bayonet, transporting a stolen car across state lines, and going through a period of being "knife crazy," among other significant points.

As the record shows, defense counsel was well acquainted with Fitzpatrick's history and had known him since the early 1960's. Given Fitzpatrick's criminal history and considering counsel's duty to avoid misleading the court, any approach taken by Adams during the sentencing hearing, other than the approach he reasonably selected,

would have had substantial and hazardous pitfalls.

The remaining areas touched by petitioner's allegations on performance of defense counsel at sentencing appear to already have been considered and ruled upon both by the District Court and this Court in prior proceedings.

Defense counsel did admit at the evidentiary hearing, in connection with the sentencing phase, that one mistake was made--namely, that he informed the court that the slaying of Alfred Falcon in the Montana State Prison was a matter of self-defense, when, in fact, petitioner denied having committed it at all. Petitioner had originally been convicted of such charge, which was affirmed on direct appeal but was later overturned in a post-conviction proceeding, resulting in the charges being dismissed. Defense counsel's copy of petitioner's presentence investigation conducted in connection with sentencing at the first trial, and which was found in Chris J. Nelson's file (petitioner's former attorney), did contain notations indicating that petitioner had admitted the prison slaying. At the evidentiary hearing, Nelson indicated that part of his sentencing strategy was to point out that, although petitioner admitted previous crimes, he maintained his innocence in this case, thereby fortifying his attempt at credibility. This notation could have misled defense counsel at the time of sentencing on the retrial in 1978.

At the evidentiary hearing, the witness Christine Fetters did testify that petitioner had made admissions to her saying that, with respect to the murder of Alfred Falcon, it was something that had to be done because he was a beast and was taking over the prison. In view of this,

the slip of defense counsel in saying it was a matter of self-defense casts petitioner's relationship with the incident in more favorable light than what the prosecution could possibly have presented if it became a contested point.

Defense Counsel John L. Adams, Jr.:

Adams graduated from the University of Montana Law School in 1954. He became a Deputy County Attorney in Billings, Montana, in 1956, and County Attorney in 1965. He served as County Attorney until 1970. From 1970 to the present he has served continuously as court-appointed defense counsel in the District Court. His legal work has been almost exclusively in the field of criminal law and he has tried at least 200 felony cases, including several capital cases.

During the first trial of the codefendants, Adams was appointed to represent Paul Bad Horse. He was assisted in his representation of Bad Horse by Jerome Cate, who was selected by the Indian tribe.

After Adams was appointed counsel to Fitzpatrick for the second trial, he discussed Fitzpatrick's case with Chris Nelson, Fitzpatrick's attorney during the original trial. In addition, Nelson gave Adams most of his work product, including witnesses' statements. Nelson had withdrawn from representing Fitzpatrick during the second trial because he had recently joined a firm which included Mr. Sinclair, a co-prosecutor in the first trial.

Adams furnished Fitzpatrick with much of the original file and later supplemented it. In addition, he and Fitz- patrick went over the notes and material Fitzpatrick

provided.

Adams was assisted in the defense by Larry Cole, the court-appointed special investigator, who was at that time an attorney licensed in Wyoming and awaiting licensing in Montana.

After defendant Radi was acquitted on retrial, Adams discussed the case with Mr. Stephens, Radi's counsel, and was given some of Stephens' case material.

Adams has known Fitzpatrick since the 1960's and made an appearance once as prosecutor in a previous charge against him. Adams has defended Fitzpatrick on other charges at least twice.

In 1972, Adams represented Fitzpatrick on "burglary, drugs and other offenses." Prior to the 1978 trial, Adams also represented Fitzpatrick when he was charged with assault involving a weapon which resulted in Fitzpatrick's imprisonment.

Prior to the second trial, Adams filed a number of motions on petitioner's behalf, including a motion to limit any testimony of Gary Radi, a notice to rely on the defense of alibi listing thirty-seven witnesses, a supplement to the alibi defense, discovery motions, a motion to dismiss, a motion for appointment of a special investigator, a motion for a change of venue, and a subsequent motion, submitted at petitioner's request, to withdraw the motion for change of venue. In addition, Adams requested that a number of subpoenas and subpoenaes duces tecum issue on behalf of Fitzpatrick and responded to the State's motion for production of evidence. Additional motions were submitted by defense counsel prior to trial and a brief relating to the

testimony of Edwin Bushman was submitted during the course of the trial. At the conclusion of the trial, Adams submitted fifty-seven jury instructions for the court's consideration.

Conflict of Interest:

Petitioner asserts that because defense counsel had represented Bad Horse at the first trial, a conflict of interest existed in that counsel could not attempt to shift suspicion from Fitzpatrick to Bad Horse. However, as a result of the first trial, Bad Horse had been acquitted of the charges of deliberate homicide and aggravated kidnapping. Clearly he cannot be tried again for those same charges in this case. Consequently, we find petitioner's argument totally without merit.

We note that at no point in the allegations of the petition or amended petition which served as the basis of the evidentiary hearing below did petitioner or his counsel allege conflict of interest as a basis for the charge of ineffective assistance of counsel. At the hearing prior to the 1978 retrial, petitioner indicated he was satisfied with counsel and wanted to withdraw his petition to have Adams removed from the case. The issue of conflict of interest was not raised on the appeal of petitioner's second conviction. As noted previously, it was not included in petitioner's list of allegations which prompted the evidentiary hearing. Now it appears. It cannot be that petitioner has suddenly become aware of such a charge. In Petition of Fitzpatrick (1970), 154 Mont. 512, 464 P.2d 507, an action filed by defendant pro se in this Court, Fitzpatrick raised the issue that he was denied his right to

counsel when certain incriminating statements were made by him to police following a shooting.

Petitioner was next before the Montana Supreme Court on the direct appeal of his conviction for the second degree murder of Alfred Falcon. State v. Fitzpatrick (1973), 163 Mont. 220, 516 P.2d 605. That appeal was unsuccessful. Subsequently, petitioner filed a pro se petition for a writ of habeas corpus in this Court the following year. The issue in that case was that Fitzpatrick's alibi defense had been hampered by a delay in appointment of counsel. This inaction on the part of the State was found to have deprived Fitzpatrick of effective representation by counsel.

Given Fitzpatrick's extensive prior experience in the criminal courts and right-to-counsel issues, his statement that he abandoned his early attempts to have Adams removed as his counsel because he feared being left without counsel on this capital case are without merit.

Further, after thorough review of the entire file in this matter, it is clear that petitioner's allegation of conflict of interest is also without merit.

Ineffective Assistance of Counsel:

The standard of review for ineffective assistance of counsel claims within this jurisdiction is known as the "reasonably effective assistance" test and may be stated as follows: "Persons accused of crime are entitled to the effective assistance of counsel acting within the range of competence demanded of attorneys in criminal cases." In order to find ineffective assistance of counsel, the errors made must be "errors a reasonably competent attorney acting as a diligent conscientious advocate would not have made,

-26-

for that is the constitutional standard." Cooper v. Fitzharris (9th Cir. 1978), 586 F.2d 1325, cert. denied, 440 U.S. 974 (1979).

In addition, when the claim of ineffective assistance of counsel rests upon specific acts and omissions of counsel, relief will be granted only if it appears that the defendant was prejudiced by counsel's conduct. Cooper, 586 F.2d at 1331.

Further, "claimed inadequacy of counsel must not be tested by a greater sophistication of appellate counsel, nor by that counsel's unrivaled opportunity to study the record at leisure and cite different tactics of perhaps doubtful efficacy. Success is not the test of efficient counsel, frequently neither vigor, zeal, nor skill can overcome the truth." State v. Forsness (1972), 159 Mont. 105, 110, 495 P.2d 176, 179. And, ". . . Hindsight cannot now be used to say what perhaps could have been done to achieve a possible but highly speculative result . . ." State v. Noller (1963), 142 Mont. 35, 38, 381 P.2d 293, 294.

Petitioner contends the proper standard for determining ineffective assistance of counsel is that enunciated in Washington v. Strickland (5th Cir. 1983), 673 F.2d 879; (Unit B) (en banc) 693 F.2d 1243, cert. granted, June 6, 1983. The Washington test is as follows: (1) petitioner has the burden of proving that his right to effective assistance of counsel was violated; (2) then petitioner must establish prejudice that worked to his actual and substantial disadvantage; and (3) a writ must be granted unless state proves counsel's ineffectiveness was harmless beyond a reasonable doubt. Petitioner has the burden to

-27-

demonstrate not only a <u>possiblity</u> of prejudice but that it worked to his actual and substantial disadvantage. <u>Washington</u>, 693 F.2d at 1258.

<u>Washington</u> also recognizes that certain lines of defense may be contradictory and thus incapable of being presented persuasively in tandem. <u>Washington</u>, 693 F.2d at 1253. Such was the case here. Petitioner alleges in his amended petition that certain witnesses should have been called to testify regarding certain evidence found in Radi's vehicle. To call such witnesses and elicit such testimony would have been totally incongruent with petitioner's alibi defense.

Even under the <u>Washington</u> analysis, it is presumed that an attorney is competent and has rendered effective assistance. We have reviewed the voluminous record in this case and the extensive and superb memorandum prepared by the District Court Judge which accompanies the order dismissing petitioner's amended petition. We find that even under the <u>Washington</u> analysis, petitioner has failed to meet his burden.

The State of Florida has sought and been granted a writ of certiorari from the United States Supreme Court regarding the <u>Washington</u> case. Florida has adopted the analysis seen in Knight v. State (Fla. 1981), 394 So.2d 997, and United States v. DeCoster (D.C. Cir. 1979), 624 F.2d 196. <u>Knight</u> requires: (1) specific omissions/acts must be detailed in an appropriate pleading; (2) defendant has burden of proof to show substantial and serious deficiency measurably below the performance of competent counsel; and (3) that within the circumstances of the case, the prejudice

was so extensive that there was a likelihood it affected the outcome of the case. (4) The State then has an opportunity to rebut by showing beyond a reasonable doubt that there was no prejudice.

Even under the Knight/DeCoster standard, petitioner here has failed to meet his burden of proof. A review of the record of this case clearly shows that petitioner has failed to meet any standard argued by his counsel.

An additional element in this case is the concept of waiver. Montana recognizes that a defendant may waive a potential conflict of interest. State v. Gallagher (1972), 162 Mont. 155, 161, 509 P.2d 852, 855. In determining whether such a conflict has been waived, it is necessary to consider the facts and circumstances surrounding the case, including the background, experience and conduct of the defendant. United States v. Partin (9th Cir. 1979), 601 F.2d 1000. We hold there was no conflict here; however, even if there had been a possible conflict of interest issue, petitioner has waived his right to raise such an issue by his conduct and statements at the pretrial hearing regarding possible appointment of other counsel, by his failure to broach the subject at trial and/or on appeal, and by his knowledge from the outset that his counsel had defended a codefendant during the first trial. Critical to this determination is the fact that this petitioner is extremely knowledgeable of the criminal justice system and has argued ineffective assistance of counsel issues in the past.

Petitioner has attempted to show that a per se conflict in interest existed in counsel's defense of Bad

Horse in the first trial and of petitioner Fitzpatrick in the second trial. However, the authorities cited fail to support this contention.

Petitioner also suggests a different standard should apply in capital cases. We decline to set a separate standard for judging effective assistance of counsel in a capital case. The reasons for refusal are well expressed in Washington v. Watkins (5th Cir. 1981), 655 F.2d 1346, 1357:

> "Innumerable practical problems would be presented by such a holding. For example, since effective assistance is not judged by hindsight, the heightened standard would have to apply to all cases in which a capital offense was charged, regardless of whether the jury subsequently convicted the defendant of a non-capital offense or refused to impose the death penalty in a capital case. Recognition of a 'sliding scale' for this constitutional standard would also suggest, for example, that a defendant charged with aggravated assault would be entitled to a more effective lawyer than one charged with simple assault or public intoxication. We decline to embark on such a treacherous path."

We agree. Our research has failed to disclose any case from any jurisdiction which has held that there is a constitutional requirement of a separate and higher standard for assistance of counsel in capital cases.

In conclusion, we find that, regardless of the tests advocated by petitioner, he has failed to support his allegation of ineffective assistance of counsel. Consequently, we hereby affirm the District Court in dismissing petitioner's amended petition.

_____
Chief Justice

-30-

We concur:

_John Conway Harrison_

_J. C. Gulbrandson,_

_Frank Filer_

Justices

_Arnold Olsen_

Honorable Arnold Olsen, District Judge, sitting in place of Mr. Justice John C. Sheehy

Mr. Justice Frank B. Morrison, Jr., specially concurring:

I concur in the result. However, I do believe that Mr. Adams's representation of Mr. Bad Horse created a potential conflict of interest. My vote to affirm is based upon waiver on the part of petitioner, Bernard Fitzpatrick.

_Frank B. Morrison_

Justice

Mr. Justice Daniel J. Shea, dissenting:

This is a death penalty case, and I remain convinced that defense counsel did not do all that he could do, and not even all that he should have done. For example, based on my previous dissents relating to the prejudicial and inconsistent jury instructions and jury verdicts, to which defense counsel did not object, a basis exists to reverse the conviction not only for the legal error inherent in the instructions and verdict forms, but also for the failure of defense counsel in a capital case to be more careful about

the instructions and verdict forms on which a death
penalty may ultimately be based.

Therefore, I would order a new trial.

<span style="margin-left:40%">_Daniel J Shea_</span>
<span style="margin-left:40%">Justice</span>