25CA1832 Peo in Interest of VS-J 04-16-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 25CA1832
Arapahoe County District Court No. 22JV30165
Honorable Bonnie McLean, Judge

The People of the State of Colorado,

Appellee,

In the Interest of V.S-J., a Child,

and Concerning M.H. and D.J.,

Appellants.

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE PAWAR
Johnson and Gomez, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 16, 2026

Ron Carl, County Attorney, Alison A. Bettenberg, Assistant County Attorney, Aurora, Colorado, for Appellee

Sheena Knight, Guardian Ad Litem

Robin Tieman, Office of Respondent Parents' Counsel, Boulder, Colorado, for Appellant M.H.

The Morgan Law Office, Kristofr P. Morgan, Colorado Springs, Colorado, for Appellant D.J.

¶ 1    D.J. (father) and M.H. (mother) appeal the judgment terminating their parent-child legal relationships with V.S-J. (the child).  We affirm.

I.    Background

¶ 2    In July 2021, the Arapahoe County Department of Human Services received a report that mother was using illicit substances while caring for the child and exposing the child to unsafe individuals.  The Department opened a voluntary case and enacted a safety plan in which the child was placed with father and C.J. (paternal grandmother).  More than a year later, the Department filed a petition in dependency or neglect because father was not adequately engaging in the case and mother continued to use illicit substances.

¶ 3    In November 2022, the parents made no-fault admissions to the petition, and the juvenile court adjudicated the child dependent or neglected.  The court then adopted treatment plans for the parents.  Mother's treatment plan required her to address substance abuse and mental health and abstain from criminal activity, while father's treatment plan required him to provide for the child's mental health and medical needs and demonstrate

1

protective parenting. Both plans also required the parents to provide the child with a safe and stable home, attend family time, participate in parenting education, and cooperate with the Department and the professionals in the case.

¶ 4 In September 2023, the Department moved to terminate the parents' parental rights. The juvenile court held an evidentiary hearing, after which it denied the motion to terminate because the Department did not establish by clear and convincing evidence that the parents were unlikely to become fit within a reasonable time.

¶ 5 More than a year later, the Department again moved to terminate the parents' parental rights. The juvenile court held an evidentiary hearing over three days between April and August 2025. After hearing the evidence, the court terminated the parent-child legal relationships between the parents and the child.

## II. Termination of Parental Rights

¶ 6 The parents assert that the juvenile court erred by terminating their parental rights. We disagree.

### A. Termination Criteria and Standard of Review

¶ 7 A juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child has been

adjudicated dependent or neglected; (2) the parent has not reasonably complied with an appropriate treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2025.

¶ 8 Whether a juvenile court properly terminated parental rights presents a mixed question of law and fact because it involves application of the termination statute to evidentiary facts. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15. We review the court's factual findings for clear error, but we review de novo its legal conclusions based on those facts. *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10.

¶ 9 The credibility of the witnesses; sufficiency, probative value, and weight of the evidence; and the inferences and conclusions drawn therefrom are within the juvenile court's discretion. *People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010). We therefore cannot reweigh the evidence or substitute our judgment for that of the juvenile court. *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 29.

## B. Treatment Plan

¶ 10 Father contends that the juvenile court erred by finding that he failed to successfully comply with his treatment plan. We are not persuaded.

¶ 11 Under section 19-3-604(1)(c)(I), the juvenile court must find that the parent (1) did not reasonably comply with the treatment plan or (2) the treatment plan was not successful. In a case subject to the expedited permanency planning provisions, such as this one, a court may not find that a parent reasonably complied with or was successful at a treatment plan when the parent "exhibits the same problems addressed in the treatment plan without adequate improvement." § 19-3-604(1)(c)(I)(B). Although absolute compliance with a treatment plan is not required, even substantial compliance may be insufficient to correct or improve the parent's conduct or condition, or to render the parent fit. *People in Interest of T.E.M.*, 124 P.3d 905, 909 (Colo. App. 2005).

¶ 12 The juvenile court determined that father had not reasonably complied with his treatment plan and that the treatment plan was not successful in rehabilitating him. Specifically, the court found that father could "check the boxes" on his treatment plan, but he

did not "have the deeper understanding to actually care full time and long term for a very high-needs child."

¶ 13    Father asserts that the juvenile court erred because the evidence shows that he complied with every aspect of his treatment plan. In support, he points to the caseworker's testimony, in which she agreed that father had complied with many of the treatment plan's requirements, including cooperating with the Department, having a stable home, and participating in family time.

¶ 14    True, the record indicates that father participated in the case and engaged in many of the treatment plan's actions steps. But the juvenile court found — and the record shows — that despite father's participation, the treatment plan was not successful in rendering him a fit parent because he could not provide for the child's significant needs. *See People in Interest of A.N-B.*, 2019 COA 46, ¶¶ 30-31 (concluding that the treatment plan was not successful where the parent had not resolved the protective concerns addressed in the plan and did not have a healthy relationship with the child); *People in Interest of D.P.*, 160 P.3d 351, 354-55 (Colo. App. 2007) (The evidence supported the court's finding that the parent had not successfully complied with the treatment plan

because "[h]e had difficulty applying what he had learned and, therefore, could not meet [the child's] needs.").

¶ 15    In this case, the juvenile court relied on the caseworker's and the parent-child interactional (PCI) evaluator's opinions. The caseworker testified that, despite the plethora of services provided to father over nearly four years, he still had no ability to understand the child's developmental needs. She noted that, to the extent father could navigate any of the child's needs, he needed significant assistance from his life skills coaches, who would not be there once the case closed. The PCI evaluator testified that she observed a significant impairment in the relationship between father and the child, noting that father could not provide for the child's basic safety needs. In fact, the evaluator said that she had never "observed such significant impairment in a parent-child relationship," which she described as "unintentional neglect."

¶ 16    Father also asserts that the juvenile court erred because his treatment plan did not require him "to have a thorough understanding of his daughter's therapeutic needs to be successful." But "[e]xplicit criteria for success need not be included in the treatment plan itself." *People in Interest of L.D.*, 671 P.2d

6

940, 946 (Colo. 1983). And in any event, father's treatment plan required him to "follow all the guidelines and recommendations made by this child's medical providers," such as her occupational and speech therapists, which necessarily required him to understand his child's therapeutic needs. We therefore reject father's argument.

¶ 17    In sum, because the record supports the juvenile court's finding that father's treatment plan was not successful and its finding comports with applicable law, we cannot disturb the court's determination. *See People in Interest of C.T.S.*, 140 P.3d 332, 335-36 (Colo. App. 2006).

## C.    Reasonable Efforts

¶ 18    Both parents argue that the juvenile court erred by finding that the Department made reasonable efforts to rehabilitate them and reunite the family. We disagree.

### 1.    Applicable Law

¶ 19    In determining fitness under section 19-3-604(1)(c), the juvenile court must consider whether the county department of human services made reasonable efforts to rehabilitate the parent and reunite the family. §§ 19-1-103(114), 19-3-208, 19-3-604(2)(h),

C.R.S. 2025. "Reasonable efforts" is defined as the "exercise of diligence and care" to reunify parents with their children, and the department's reasonable efforts obligation is satisfied if it provides services in accordance with section 19-3-208. § 19-1-103(114).

¶ 20 When determined "necessary and appropriate," the department must provide (1) screening, assessments, and individual case plans; (2) home-based family and crisis counseling; (3) information and referral services; (4) family time; and (5) placement services. § 19-3-208(2)(b). The juvenile court should consider whether the services provided were appropriate to support the parent's treatment plan, *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011), by "considering the totality of the circumstances and accounting for all services and resources provided to a parent to ensure the completion of the entire treatment plan," *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 33.

2. Reasonable Accommodations Under the Americans with Disabilities Act

¶ 21 Both parents contend that the juvenile court erred by finding that the Department made reasonable efforts by providing

reasonable accommodations under the Americans with Disabilities Act (ADA). We disagree.

¶ 22     If a parent is a person with a qualifying disability under the ADA, the juvenile court must consider whether the department made reasonable accommodations for the parent's disability when determining if the department made reasonable efforts. *See People in Interest of S.K.*, 2019 COA 36, ¶ 34; *see also* § 19-3-208(2)(g) (noting that services provided under section 19-3-208 must comply with the ADA). A parent may be a qualified individual with a disability if the parent has a "physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). "[W]hat constitutes a reasonable accommodation will vary from case to case based on the child's health and safety needs, the nature of the parent's disability, and the available resources." *S.K.*, ¶ 39.

¶ 23     In the dependency or neglect petition, the Department noted that there were "ongoing concerns" related to father's "cognitive functioning" and mother's "functioning and emotional regulation," as well as her substance dependence. However, neither parent asserted that they had qualifying disabilities under the ADA or that

they needed accommodations before the juvenile court adopted treatment plans for them in November and December 2022. *See S.Z.S.,* ¶ 16 (noting that "if the parent knows or has reason to know she has an ADA-cognizable disability, the issue should be raised before the court adopts a treatment plan and enters a dispositional order").

¶ 24 A few months after the juvenile court adopted father's treatment plan, the caseworker noted in her report that there had been discussions "about a possibl[e] psychological evaluation for [father] to get [a] better understanding of his cognitive capacities . . . and also provide him some other services if he were to qualify." In the next report, the caseworker stated that father was scheduled for a psychological evaluation in May 2023. Thereafter, there is no mention in the court file about whether father completed the psychological evaluation or if he was diagnosed with any cognitive impairment that would qualify him to receive accommodations under the ADA.

¶ 25 As noted above, the Department moved to terminate the parent's parental rights in September 2023. In preparation for the hearing, the parties filed a joint trial management certificate

(JTMC); in the JTMC, both parents asserted for the first time in the juvenile court that they had ADA-qualifying disabilities, which the Department failed to accommodate.  They did not, however, provide any information related to their disabilities or what accommodations they needed.

¶ 26     At the first termination hearing, the caseworker testified that she thought that father had "some kind of cognitive disability" and that mother was an "adult with a disability."  Yet she said that the parents had not provided the Department with documentation about any diagnoses or requested any accommodations.  The caseworker also testified that father completed the psychological evaluation and that the evaluation noted some deficiencies in his cognitive functioning, but she did not testify that he had been diagnosed with any mental impairment that would qualify him for accommodations under the ADA.  Despite this record, the juvenile court found that the ADA "clearly applie[d]" because of father's "developmental delays" and mother's "mental health and substance abuse."  The court determined that the Department had made reasonable efforts to accommodate both parents' disabilities but still denied the motion to terminate as described above.

11

¶ 27    At the second termination hearing, the caseworker testified that the Department had accommodated father's disability by referring him to two different life skills providers who had specializations in supporting parents with disabilities. She said that the life skills workers aided father in navigating his various appointments and understanding the child's needs. The caseworker also testified that mother lived in a "host home" that provided "wraparound services" to accommodate her disability, which included housing, transportation, medication management, scheduling, and daily activities. Again, the caseworker noted that neither parent made any specific requests for accommodations.

¶ 28    Based on this record, the juvenile court found that the Department had made reasonable efforts to accommodate father's disability, pointing to the "high-level intensive life skills service providers" that the Department had made available to father. The court also found that the Department made reasonable accommodations for mother by arranging for her to live at the host home.

¶ 29     Nevertheless, the parents assert, for the following three reasons, that the Department failed to make reasonable accommodations for their disabilities.  We are not persuaded.

¶ 30     First, father asserts that the Department failed to make reasonable efforts because it did not do enough to gather information about his disability.  Generally, it is the parent's responsibility to disclose information about a disability to the department and juvenile court.  *See S.K.*, ¶ 21.  But as the record shows in this case, father never provided the Department with any documentation about his disability.  Still, the record indicates that the Department made some efforts to gather more information about father's disability by referring him to a psychological evaluation.  But from what we can discern from the record before us, this evaluation did not reveal that father had a disability that would qualify him to receive funding for specialized services, so the Department used its own funds to provide services, as noted above.  Because father does not assert that the services provided by the Department were insufficient to accommodate his disability, nor does he describe any other accommodations that he needed, we discern no error.

¶ 31    Second, father asserts that the Department failed to reasonably accommodate his disability because the PCI evaluator did not have any special training in assessing a cognitively-impaired parent and was not told that father had a cognitive disability before performing the PCI. But father does not direct us to anything in the record supporting either of these points. As to the first point, we see no testimony about the evaluator's training (or lack thereof) in assessing cognitively-impaired parents. In fact, father stipulated to the evaluator's expertise and did not conduct any voir dire about her ability to assess cognitively-impaired parents. As to the second point, the evaluator said that she spoke with father's life skills worker before the evaluation and that she knew that he was receiving services for a developmental disability. In other words, contrary to father's assertion, the record indicates that the evaluator was aware of father's disability. We therefore cannot say that the Department failed to make reasonable accommodations on this basis.

¶ 32    Third, mother asserts that the Department failed to make reasonable efforts because the "caseworker for much of the case" had "absolutely no training on working with parents with

14

disabilities" and "never put in any referrals for agencies that would be good for parents with disabilities." True, the caseworker that testified at the *first* termination hearing said that she did not have training working with disabled parents. But a new caseworker took over the case a few months after the first termination hearing. And mother does not direct us to anything in the record indicating that this caseworker lacked training on working with parents with disabilities or failed to make referrals to agencies experienced with assisting parents who might need disability-related accommodations. Nor does mother explain how the lack of training on the caseworker's part amounted to a lack of reasonable accommodations when considering that the Department arranged for mother to live in a host home that was specialized in providing services to individuals with disabilities. We therefore reject her assertion.

### 3. Other Contentions

The parents also assert, for three additional reasons described below, that the Department failed to make reasonable efforts. We are not persuaded.

¶ 34　First, father argues that the Department did not arrange for him to participate in the child's therapeutic and educational appointments. To begin, we note that father has not directed us to anything in the record indicating that the Department or juvenile court prevented him from attending these appointments. And the record shows that the Department provided father with assistance from life skills workers, who were tasked with helping father understand the child's needs and attend the meetings with the providers. We therefore discern no error. *See People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011) (noting that, once the department provides the necessary services, it is the "parent's responsibility to use those services to obtain the assistance that he or she needs to comply with his or her treatment plan's requirements").

¶ 35　Next, mother contends that the Department failed to provide her with co-parenting services. But mother testified that the Department provided her with a parenting education class that focused on co-parenting skills. And in any event, mother's inability to co-parent with father was not the basis of mother's unfitness. We therefore discern no error.

¶ 36    Finally, mother asserts that the Department failed to provide father and paternal grandmother with housing services when they lost their housing.  Generally, a parent does not have standing to raise an issue related to the other parent.  *See People in Interest of J.A.S.*, 160 P.3d 257, 261 (Colo. App. 2007).  Indeed, we cannot see how the failure to provide father and paternal grandmother with housing resources could have impacted mother's rehabilitation.  Nor do we discern how, under the circumstances presented in this case, providing father and paternal grandmother with housing would have aided in reunifying the child with mother.  We therefore reject mother's assertion.

## D.    Less Drastic Alternative

¶ 37    Mother maintains that the juvenile court erred by finding that there was no less drastic alternative to termination.  We disagree.

¶ 38    Before terminating parental rights under section 19-3-604(1)(c), the juvenile court must consider and eliminate less drastic alternatives.  *People in Interest of M.M.*, 726 P.2d 1108, 1122 (Colo. 1986).  In considering less drastic alternatives, a court must give primary consideration to the child's physical, mental, and emotional conditions and needs.  § 19-3-604(3).

¶ 39     A viable less drastic alternative must do more than adequately meet a child's needs; rather, it must be in the child's best interests. *A.M.*, ¶ 27.  Therefore, if the juvenile court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the less drastic alternative and order termination. *Id.* at ¶ 32.  Under those circumstances, we must affirm the court's decision if its findings are supported by the record. *People in Interest of B.H.*, 2021 CO 39, ¶ 81.

¶ 40     The juvenile court found that there was no less drastic alternative to termination.  Specifically, the court declined to grant an allocation of parental responsibilities (APR) to paternal grandmother because the child's needs had not been met when she previously lived with paternal grandmother and father continued to live in the home with her.  The court also noted that the child was in a permanent home with her foster parents who could provide for all her needs, and therefore termination and adoption was in the child's best interests.

¶ 41     The record supports the juvenile court's findings.  The caseworker testified that it was in the child's best interests that mother's parental rights be terminated because mother had made

minimal progress in addressing her substance abuse. The caseworker opined that, based on the child's age and how long the case had been open, termination and adoption was the best option for her because she needed permanency. The caseworker also said that an APR would not be an appropriate option, and she was not sure whether the foster parents would even be open to one. Finally, the caseworker testified that placement with paternal grandmother was not a viable option because she did not understand the child's needs, she had not shown that she could meet the child's needs in the past, and father continued to reside in the same home.

¶ 42    Despite this record, mother asserts that there was a less drastic alternative to termination because she had a bond with the child. To be sure, a juvenile court may consider the bond between a child and parent when deciding if there is a viable less drastic alternative to termination. *See People in Interest of N.D.V.*, 224 P.3d 410, 421 (Colo. App. 2009). But this is just one relevant factor among many. *See A.R.,* ¶ 38. And as described above, the court considered other factors in rejecting a less drastic alternative to termination. Because the record supports those reasons, we cannot disturb the court's decision. *See B.H.,* ¶ 80; *S.Z.S.,* ¶ 29.

¶ 43 Mother also asserts that the juvenile court erred in rejecting a less drastic alternative because it applied the wrong legal test when it focused on which placement option was better rather than on whether termination was in the child's best interests.  We disagree.  The record indicates that the court properly considered whether there were any less drastic alternatives to termination by considering whether an APR was a viable option.  *See A.M.*, ¶ 32.  But because placement with paternal grandmother was not an option, nor was an APR to the foster parents, the court had to eliminate an APR as a less drastic alternative.  *See id.*  And as there were no other alternatives, the court determined that termination and adoption was in the child's best interests.  We therefore conclude that the court applied the correct legal test.

### III.   Disposition

¶ 44 The judgment is affirmed.

JUDGE JOHNSON and JUDGE GOMEZ concur.