Bernard J. FITZPATRICK, Petitioner–Appellant,

v.

Jack McCORMICK,* Warden of the Montana State Prison, Respondent–Appellee.

No. 87–4027.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 12, 1988.

Decided March 7, 1989.

---

* Jack McCormick is substituted for his predecessor, Henry Risley, Warden of the Montana State Prison, pursuant to Fed.R.App.P. 43(c)(1).

Timothy K. Ford, Seattle, Wash., Michael D. Laurence, San Francisco, Cal., for petitioner-appellant.

Kathy Seeley, Asst. Atty. Gen., Helena, Mont., for respondent-appellee.

Before POOLE, CANBY and LEAVY, Circuit Judges.

LEAVY, Circuit Judge:

Bernard J. Fitzpatrick appeals the district court's denial of his petition for habeas corpus relief. Fitzpatrick was convicted by a Montana state court and sentenced to death for deliberate homicide, to death for aggravated kidnapping, and to 100 years for robbery. He raises numerous grounds on which he argues the district court should be reversed. We reverse the dis-

trict court without making a determination of all issues raised.

## PRIOR PROCEEDINGS

In October 1975, the petitioner, Bernard J. Fitzpatrick, and three codefendants were tried together on charges stemming from the kidnapping, robbery, and murder of a grocery store employee. Fitzpatrick and one codefendant, Gary Radi, were convicted of deliberate homicide, aggravated kidnapping, and robbery. They were each sentenced to 100 years imprisonment for the deliberate homicide, 100 years imprisonment for the robbery, and death by hanging for the aggravated kidnapping. Codefendants Paul Bad Horse and Travis Holliday were convicted of robbery and each sentenced to forty years in prison. A fifth codefendant, Edwin Bushman, was granted immunity and testified for the state.

On October 19, 1977, the Montana Supreme Court held that it was prejudicial error to try the defendants jointly. It reversed the convictions and remanded for a separate new trial. *State v. Fitzpatrick*, 174 Mont. 174, 569 P.2d 383 (1977).

On retrial, Fitzpatrick was represented by John Adams, Jr., who had been counsel for Bad Horse at the first trial. Fitzpatrick's second trial was held in February 1978. In 1977, the Montana legislature repealed the deliberate homicide and aggravated kidnapping statutes under which Fitzpatrick was originally sentenced, and enacted the statutes under which he was sentenced at his second trial.[1] The jury found him guilty of deliberate homicide, aggravated kidnapping, and robbery.[2] The trial judge sentenced Fitzpatrick to death for the deliberate homicide, death for the aggravated kidnapping, and 100 years imprisonment for the robbery.

The Montana Supreme Court affirmed Fitzpatrick's convictions and sentences. *State v. Fitzpatrick*, 186 Mont. 187, 227, 606 P.2d 1343, 1365 (1980). Fitzpatrick filed two petitions for writ of certiorari to the United States Supreme Court, both of which were denied. *Fitzpatrick v. Montana*, 449 U.S. 891, 101 S.Ct. 252, 66 L.Ed.2d 118 (1980); *Fitzpatrick v. Sentence Review Div.*, 449 U.S. 891, 101 S.Ct. 252, 66 L.Ed.2d 119 (1980).

On November 6, 1980, Fitzpatrick filed a state postconviction petition which was dismissed. On appeal, the Montana Supreme Court reversed the dismissal in part, remanding Fitzpatrick's claim of ineffective assistance of counsel to the trial court for an evidentiary hearing. *Fitzpatrick v. State*, 638 P.2d 1002 (Mont.1981). Following a five day evidentiary hearing, the state trial court dismissed Fitzpatrick's claim. The Montana Supreme Court affirmed. *Fitzpatrick v. State*, 206 Mont. 205, 671 P.2d 1 (1983).

On December 8, 1983, Fitzpatrick filed a petition for a writ of habeas corpus in the United States District Court for the District of Montana, contending the writ should be granted on any one of numerous grounds, and requesting an evidentiary hearing. Both the State and Fitzpatrick moved for summary judgment.

---

**1.** Fitzpatrick was originally sentenced to 100 years for deliberate homicide under Rev.Code Mont. § 94–5–105 (1947). That statute provided that the court should impose the death penalty on a person convicted of deliberate homicide if at least one of five statutory aggravating circumstances was present, "unless there are mitigating circumstances." Rev.Code Mont. § 94–5–105(1). Because the last phrase saved the deliberate homicide statute from being designated a mandatory death penalty statute, the Montana Supreme Court held the statute was constitutional. *State v. McKenzie*, 186 Mont. 481, 608 P.2d 428 (1980). *See State v. Fitzpatrick*, 186 Mont. 187, 229, 606 P.2d 1343, 1366 (1980). The statute under which Fitzpatrick was originally sentenced to death for aggravated

kidnapping, Rev.Code Mont. § 94–5–304 (1947), mandates the death penalty if the victim is dead as a result of the kidnapping. The Montana Supreme Court declared it unconstitutional in *State v. Coleman*, 177 Mont. 1, 579 P.2d 732 (1978). In 1977 the Montana legislature enacted a new death penalty statute, Rev.Code Mont. §§ 95–2206.6–.15, under which Fitzpatrick was sentenced at his second trial on both the deliberate homicide and aggravated kidnapping convictions. This is codified at Mont.Code Ann. §§ 46–18–301 to 46–18–310 (1985).

**2.** On retrial, Bad Horse and Holliday were again convicted of robbery, and Radi was acquitted on all counts.

The district court granted the state's motion for summary judgment and denied Fitzpatrick's. Fitzpatrick appealed.

## FACTS

Fitzpatrick has at all times denied, and continues to deny, that he was involved in the robbery, kidnapping, or homicide. Following is a summary of the evidence which the Montana Supreme Court found sufficient to support the jury's verdict. *Fitzpatrick*, 186 Mont. at 190–93, 606 P.2d at 1345–47.

On April 5, 1975, Fitzpatrick and Holliday met Bad Horse and Bushman in a bar in Billings, Montana. While playing pool, the men discussed the feasibility of robbing the Safeway store in Hardin, Montana. Bushman drew lines on a napkin to represent the streets of Hardin, and others marked "X's" to show the location of the Safeway store and the bank. Bad Horse explained that an employee left the store at 10:00 p.m. each night and went to the local drive-in bank to make the night deposit.

The four men got into a car driven by Bushman, picked up three teenage girls, and went to a house in Billings at Fitzpatrick's direction. Fitzpatrick went into the residence and emerged soon thereafter, placing what appeared to be a gun under his belt. The car then proceeded to another residence in Billings, arriving at approximately 6:00 p.m. Once inside, Fitzpatrick and Holliday introduced the others to the occupant of the house, Radi. At Radi's house, Fitzpatrick revealed the .45 caliber automatic handgun he had placed under his belt and cautioned that it was loaded.

It was planned that Fitzpatrick and Radi would take Radi's car (a metallic blue 1971 Pontiac) to Hardin, and Holliday, Bushman, and Bad Horse would travel in Bushman's car to Hardin. Two of the girls went in Bushman's car, the third stayed behind in Billings.

The cars arrived in Hardin at approximately 8:00 p.m. The girls were dropped off at the Becker Bar. The five men, all in Bushman's car, then drove past the drive-in bank and Safeway store.

They returned to the bar, where all the men except Bushman got into Radi's car and drove back to the Safeway store. Bushman returned the car he had been driving, which was his girlfriend's, to his own house in Hardin and picked up his own car, which had some rope in the trunk.

Bushman then met the others at the Safeway store. The rope was cut into two pieces and given to Fitzpatrick. The five men sat in their cars in front of the Safeway store until 10:00 p.m. The store closed, and Everett Stoltz, the store manager, came out and drove away. Fitzpatrick and Radi followed Stoltz in Radi's car. Monte Dyckman, the assistant store manager, also came out of the store at that time and drove away in a pickup. Bushman, Bad Horse, and Holliday followed Dyckman in Bushman's car.

Stoltz drove directly to his home. Fitzpatrick and Radi, realizing that Stoltz would not be making the night deposit, drove to the drive-in bank. Previously, the five men had agreed that should either car follow the wrong employee, that car would go to the bank and wait for the deposit to be made.

Monte Dyckman stopped at the post office before going to the bank. When those in Bushman's car saw Dyckman turn into the bank, Holliday said, "They've got him now." The Bushman car then dropped the pursuit. After spending some time drinking in Hardin, Bushman, Bad Horse, Holliday, and the two girls returned to Billings in Bushman's car.

At approximately 10:30 p.m., witnesses observed Dyckman's vehicle traveling at high speed down a street in Hardin. Two persons were in the truck, a driver and a passenger slumped against the door. Close behind was a dark blue car. Soon thereafter, a man traveling on the interstate highway was passed by a truck, which he recognized as Dyckman's, and a car following Dyckman's truck. Both vehicles were traveling at high speed. The vehicles turned off the highway at an area known as the Toluca interchange.

In the early morning of April 6, 1975, County Undersheriff John Fergusen found

Dyckman's truck parked behind a gravel pile near the Toluca interchange. He discovered Dyckman lying on the passenger seat, dead. He had been shot in the head twice with a gun held less than six inches away. His hands were bound with rope found to be that from Bushman's car. Numerous footprints and tire tracks were in the area. A search revealed two .45 caliber shell casings in Dyckman's truck and two outside his truck.

Bushman, Holliday, and Bad Horse arrived at Radi's house in Billings at approximately 2:30 a.m. on April 6. About the same time, Radi returned and the four men discussed the robbery. Fitzpatrick was not present. Bushman testified that Radi explained that Fitzpatrick had grown tired of waiting for the Safeway employee at the bank, and had stepped out of the car and taken off the mask he was wearing. Dyckman then pulled into the bank and stepped out of his car. Fitzpatrick and Radi seized him. When asked how much money was taken, Radi stated that the bag contained only $200 in cash and some food stamps and checks. Bushman testified that Radi then said, "Fritz didn't have to shoot the kid. Boom, boom, he shot his head off." "Fritz" was identified as being the defendant Fitzpatrick.

Fitzpatrick's girlfriend, Christine Fetters, testified that in the early morning of April 6, Fitzpatrick telephoned her and instructed her to buy two bus tickets to Butte, Montana, and to meet him at the bus depot. The couple traveled to Butte that morning by bus. Fitzpatrick was apprehended on June 3, 1975, in Spokane, Washington.

## DISCUSSION

### I. Whether Fitzpatrick was Denied Effective Assistance of Counsel

At his second trial, Fitzpatrick was represented by a court-appointed attorney, John Adams, Jr., who had represented Paul Bad Horse at the first trial. Fitzpatrick claims he was denied constitutionally adequate representation because Adams had a conflict of interest when he represented him. Fitzpatrick claims that although he has at

all times professed his innocence, Adams did not believe him. Fitzpatrick has maintained a defense that he did not kill Dyckman, but rather Bad Horse, Bushman, and Holliday did. He contends that because of Adams' prior representation of Bad Horse, Adams was convinced that Bad Horse did not kill Dyckman, and therefore Adams refused to offer this theory to the jury. Fitzpatrick alleges that Adams did not offer evidence, or pursue questioning, that would have cast Bad Horse as the possible killer.

Whether an attorney has rendered effective assistance of counsel is a mixed question of law and fact, reviewed de novo. *Mannhalt v. Reed,* 847 F.2d 576, 579 (9th Cir.1988). *See also Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

The sixth amendment guarantees the right to counsel as part of a defendant's fundamental right to a fair trial. *Strickland,* 466 U.S. at 684–85, 104 S.Ct. at 2063. The right to counsel is the right to effective assistance of counsel. *Id.* at 686, 104 S.Ct. at 2063. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. at 2064.

The guarantee of effective assistance of counsel comprises two correlative rights: the right to reasonably competent counsel and the right to counsel's undivided loyalty. *Mannhalt,* 847 F.2d at 579 (citations omitted). To establish a Sixth Amendment violation based on a conflict of interest, a defendant must show: (1) his attorney actively represented conflicting interests, and (2) an actual conflict of interest affected his attorney's performance. *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980); *Mannhalt,* 847 F.2d at 579–80. Unlike a challenge to counsel's competency, prejudice is presumed if the defendant makes such a showing. *Cuyler,* 446 U.S. at 349–50, 100 S.Ct. at 1719; *Mannhalt,* 847 F.2d

at 580; *United States v. Crespo de Llano,* 838 F.2d 1006, 1013 (9th Cir.1987). Prejudice is presumed because "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests." *Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067.

Conflicts of interest can arise both in cases of simultaneous representation and successive representation, though it generally is more difficult to demonstrate an actual conflict resulting from successive representation. *Mannhalt,* 847 F.2d at 580. We have stated, in a civil case, that preservation of a proper attorney-client relationship requires "a rule that prevents attorneys from accepting representation adverse to a former client if the later case bears a substantial connection to the earlier one.... Substantiality is present if the factual contexts of the two representations are similar or related." *Trone v. Smith,* 621 F.2d 994, 998 (9th Cir.1980) (citations omitted).

This rule is necessary because "[t]he mere possession of a former client's and codefendant's privileged communications poses the precise potential for conflict." *United States v. Wheat,* 813 F.2d 1399, 1402 (9th Cir.1987), *aff'd,* —— U.S. ——, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). In successive representation, "conflicts of interest may arise if the cases are substantially related or if the attorney reveals privileged communications of the former client or otherwise divides his loyalties." *Mannhalt,* 847 F.2d at 580. Among the dangers in a successive representation situation is that the attorney who has obtained privileged information from the former client may fail to conduct a rigorous cross-examination for fear of misusing that confidential information. *United States v. Agosto,* 675 F.2d 965, 971 (8th Cir.1982). The potential for conflicting interests is particularly acute when, as here, the two clients are, or were, codefendants who allege different levels of culpability in the crime. *Wheat,* 813 F.2d at 1403.

Adams' representation of Fitzpatrick meets the first prong of the *Cuyler* test: he actively represented conflicting interests when he represented Fitzpatrick after his representation of Bad Horse. Fitzpatrick's defense was that he did not commit the crimes; rather, Bad Horse, Bushman, and Holliday did. Thus, Fitzpatrick's defense theory was in direct conflict with that of Bad Horse.

The second prong of the *Cuyler* test requires a showing that the conflict affected counsel's performance. Adams' testimony at the post conviction hearing satisfies us that Adams' trial performance was indeed affected by the conflict.

Specifically, Adams failed to present evidence which, if offered, might have put enough uncertainty into the minds of the jury as to undermine a conviction beyond a reasonable doubt that Fitzpatrick committed the murder. Adams did not elicit testimony from Iva Lee Finch regarding a conversation she overheard among Bad Horse, Bushman, and Holliday. The witness was one of the teenage girls who had traveled to Hardin with Bad Horse, Bushman, and Holliday. While she was riding with them back to Billings after the crimes, she overheard a conversation concerning Bad Horse hurting someone, which he "shouldn't have done." Evidence of this conversation was not presented to the jury.

In the state court evidentiary hearing on whether Fitzpatrick was denied effective assistance of counsel, Adams testified:

Q. Would you have felt free at that time, given your previous relationship with Paul Bad Horse, to have explored a defense which would have implicated him as the guilty party in the Monte Dyckman homicide?

A. That opportunity was afforded the state and I'm sure they did not try to conceal any evidence and I would not have explored it for the reason it would have been a lie.

Q. Would you have felt free had you not believed it to be a lie, given your previous relationship with Mr. Bad Horse, to have explored it?

A. Yes.

Q. Did you explore it?

A. No. For the reasons that I gave.

. . . .

Q. Now, Mr. Adams, in your experience as an attorney, do you find that your role as an advocate for a particular side sometimes tends to affect your perception of the facts and what you tend to convince yourself of the facts that you plead? Do you ever find that?

A. That calls for expounding.

Q. Expound.

A. Attorneys today have the belief that their job is to defend a client. They are to represent a client to the best of their ability, to insure that his rights at every stage of the proceeding are protected. But they should never lose sight of the fact that a court of law is a court where truth is sought and should be brought forward. Answers and questions should not infer incorrect inferences. The attorney is neither honest with himself nor honest with the public nor honest with his profession if he tries to do so. When I go into a case I go in as an advocate representing a client to give him the very best of my professional ability to see that he is properly represented in the courtroom, that undue advantage is not taken of him, either by the prosecution or by, perhaps, the laxity of the court. I've never found the courts lax, but it could be. Therefore it is my job to see that that client, my client, is represented. My approach to a problem is, if the client is innocent, I'll go to hell for him, including going to jail, if necessary, to try and protect him. If my client has, for reasons that I won't divulge, left me with the belief that he may be guilty, I will still make the state prove its charge, because that is our constitutional right, that is the system on which this government has been based, and I do my very best under such circumstances to see that he is protected in every state of the proceeding, by objection, by answer, by argument and by otherwise, and to test to the fullest of my ability the truth and reliability of any statements that are put on the witness stand. A witness who is honest and does not exaggerate is a witness that need not be cross-examined. A witness that exaggerates, though they be honest, must be cross-examined and those exaggerations brought home to the jury. They may cause the jury to change its position.

In respect to this case, or any other case that I've represented a client, I've given him the best of my professional ability, and always will, but it will be within the ethics of the profession and one of those ethics is do not suborn perjury, do not try to deliberately mislead, knowing it's misleading of a jury, do not deliberately deceive, because you are in a court of law, which is a place where truth is sought and a place where truth should be brought forward.

Now, with that pontificating, I hope I have answered your question.

Q. You did not doubt it was true that Iva Lee Finch had made the statements that were recorded pre-trial, did you?

A. I did have no doubt that she will say—If you will note, the statement is somewhat leading and inferential.

. . . .

Q. And when you represented Paul Bad Horse, I take it that you came to the conclusion or the impression that Mr. Bad Horse was telling the truth with regard to his story that he was in Hardin elsewhere on the evening in question and was not involved in the homicide?

A. To answer that question inferredly would invade attorney-client relations, and rather than inferredly or otherwise, I will say that I will stand on attorney-client privileges regarding my knowledge or lack of knowledge of this case.

Adams' testimony proves that his belief in Bad Horse's innocence was produced in the attorney-client relationship based on communication which he protected by the attorney-client privilege and that it affected his performance in Fitzpatrick's trial. Prejudice is presumed. *Mannhalt,* 847 F.2d at 579. We hold that Fitzpatrick was denied his sixth amendment right to effective assistance of counsel.[3] We reverse the district court.

**3.** We reject the State's suggestion that Fitz- patrick waived any objection to Adam's poten-

## II. Whether Fitzpatrick's Death Sentence for Deliberate Homicide Violates the Double Jeopardy Clause

The Double Jeopardy Clause of the Fifth Amendment, applicable to the states by the Fourteenth Amendment, provides that in criminal proceedings no person shall be placed twice in jeopardy for the same offense. At Fitzpatrick's first trial in 1975, the judge sentenced him to life imprisonment for deliberate homicide. The death penalty statute then in effect directed the court to impose the death penalty on a person convicted of deliberate homicide if at least one of five statutory aggravating circumstances was present, unless there were mitigating circumstances. Rev.Code Mont. § 94–5–105 (1947).

In 1977, the Montana Legislature repealed this statute and enacted the one under which Fitzpatrick was sentenced after retrial. Mont.Code Ann. §§ 46–18–301 to 46–18–310 (1985).[4] The aggravating circumstances portion of the statute potentially applicable to Fitzpatrick was not changed. However, the new statute directs the court to impose the death penalty if it finds one or more aggravating circumstances exist and "there are no mitigating circumstances sufficiently substantial to call for leniency." Mont.Code Ann. § 46–18–305. In this appeal, the State does not dispute Fitzpatrick's contention that at his second sentencing hearing, the State did not present any additional aggravating factors or any evidence disputing the existence of any mitigating factors presented at the first trial. Nevertheless, Fitzpatrick was sentenced to death for deliberate homicide following the second trial, apparently because the second trial judge found one of the statutory aggravating circumstances to exist: that the deliberate homicide was committed by a person lying in wait or ambush. Mont.Code Ann. § 46–18–303(4). *Fitzpatrick*, 186 Mont. at 218, 606 P.2d at 1360. The trial judge did not find any mitigating circumstances warranting leniency. *Id.*

■ The Double Jeopardy Clause forbids the retrial of a defendant who has been acquitted of the crime charged. The Supreme Court has been reluctant to extend this principle to sentencing. *Bullington v. Missouri*, 451 U.S. 430, 438, 101 S.Ct. 1852, 1857, 68 L.Ed.2d 270 (1981). However, the Court has recognized that a bifurcated sentencing trial in a death penalty case is comparable to a guilt trial for purposes of double jeopardy. The death penalty sentencing procedure

> differs significantly from those employed in any of the Court's cases where the Double Jeopardy Clause has been held inapplicable to sentencing.... The presentence hearing resemble[s] and, indeed, in all relevant respects [is] like the immediately preceding trial on the issue of guilt or innocence....

*Id.* at 438; 101 S.Ct. at 1858.

In *Bullington*, the Court held that the Missouri capital sentencing statute violated the Double Jeopardy Clause because it permitted the defendant, who had been sentenced to life imprisonment at his first trial but had successfully appealed his conviction, to be sentenced to death upon retrial. The Court held that because at the defendant's first sentencing hearing the jury

---

tial conflict of interest by failing to object to Adams' representation at a hearing prior to his second trial. The proceedings at the hearing do not reflect a discussion of the potential conflict. *See Fitzpatrick v. State*, 206 Mont. 205, 212–13, 671 P.2d 1, 4–5 (1983). We do not think that Fitzpatrick's mere knowledge that Adams represented Bad Horse at the first trial is a basis for waiver of any conflict of interest objections at his second trial.

**4.** The Montana Supreme Court upheld the constitutionality of the statute under which Fitzpatrick was originally sentenced to life imprisonment for the deliberate homicide. *State v. McKenzie*, 186 Mont. 481, 608 P.2d 428 (1980).

This court found the statute constitutional in *McKenzie v. Risley*, 842 F.2d 1525 (9th Cir.1988).

We make no mention of Fitzpatrick's claim that his retrial under the new death penalty statute violates the ex post facto clause of the Constitution. The same argument was raised in *Coleman v. Risley*, 839 F.2d 434, 441–45 (9th Cir.1988). The *Coleman* opinion, however, was withdrawn for en banc consideration. *Coleman v. Risley*, 845 F.2d 884 (9th Cir.1988). Without suggesting that the resulting opinion will deal with this argument, we nevertheless find it advisable to refrain from deciding Fitzpatrick's petition on this ground.

was required to determine whether the prosecution had "proved its case" as to the elements required to impose the death penalty and the jury imposed a life sentence, "the jury has already acquitted the defendant of whatever was necessary to impose the death sentence." *Id.* at 444–45, 101 S.Ct. at 1861 (citations omitted).

The Supreme Court applied this reasoning to the Arizona death penalty procedure in a case similar to this. *Arizona v. Rumsey*, 467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed. 2d 164 (1984). Rumsey was convicted after a trial of armed robbery and first degree murder. Following trial, the judge, without a jury, conducted a separate sentencing hearing to determine, according to the state's statutory scheme for considering aggravating and mitigating circumstances, whether death was the appropriate sentence. The judge found that no aggravating circumstances were present, and sentenced Rumsey to life imprisonment for murder and a consecutive sentence for the armed robbery.

Rumsey appealed, arguing that imposition of consecutive sentences violated state and federal law. This appeal permitted the State to cross-appeal on the ground that the trial judge wrongly interpreted the aggravating circumstance of murder for pecuniary gain. The Arizona Supreme Court rejected Rumsey's challenge, but agreed with the State regarding the proper interpretation of the pecuniary gain aggravating circumstance and remanded the case for resentencing.

In a new sentencing hearing on remand, the trial court found that given the state supreme court's definition of murder for pecuniary gain, the circumstance applied to Rumsey and it resentenced him to death.

The United States Supreme Court held that the Double Jeopardy Clause barred the imposition of the death penalty after that sentence had been rejected in the first proceeding:

> The double jeopardy principle relevant to respondent's case is the same as that invoked in *Bullington:* an acquittal on the merits by the sole decisionmaker in the proceeding is final and bars retrial on the same charge. Application of the *Bullington* principle renders respondent's death sentence a violation of the Double Jeopardy Clause because respondent's initial sentence of life imprisonment was undoubtedly an acquittal on the merits of the central issue in the proceeding—whether death was the appropriate punishment for respondent's offense.

*Id.* at 211, 104 S.Ct. at 2310.

The Supreme Court also held that the trial judge's reliance on an error of law at the first sentencing proceeding did "not change the double jeopardy effects of a judgment that amounts to an acquittal on the merits." *Id.*

Since *Rumsey*, other circuit courts have found that "after a death penalty sentencing proceeding, where there is an implicit acquittal from the death penalty based on facts presented, the defendant ... is protected by the double jeopardy clause from subjection to a second hearing where the death penalty may be imposed." *Bullard v. Estelle*, 665 F.2d 1347, 1357 (5th Cir. 1982), *vacated on other grounds*, 459 U.S. 1139, 103 S.Ct. 776, 74 L.Ed.2d 987 (1983); *see also, Young v. Kemp*, 760 F.2d 1097, 1107 n. 12 (11th Cir.1985), *cert. denied*, 476 U.S. 1123, 106 S.Ct. 1991, 90 L.Ed.2d 672 (1986).

■ In this case, Fitzpatrick had a separate sentencing proceeding following his first trial, at which the State had the burden of showing the existence of aggravating circumstances. This permitted the presentation of additional evidence not introduced at trial. The first judge's imposition of life imprisonment was essentially a judgment in Fitzpatrick's favor as to the existence of any aggravating or mitigating circumstances, and amounts to an "acquittal on the merits" for purposes of the death penalty. The first trial judge, under a statute found constitutional by the Montana Supreme Court and this court, determined that death was inappropriate for Fitzpatrick. "Having received 'one fair opportunity to offer whatever proof it could assemble,' the State is not entitled to anoth-

er." *Bullington*, 451 U.S. at 446, 101 S.Ct. at 1862 (citations omitted).

## CONCLUSION

We reverse the district court's denial of the writ of habeas corpus on the ground that Fitzpatrick was denied effective assistance of counsel. We also hold that the sentence of death for deliberate homicide violated Fitzpatrick's Fifth Amendment rights in that it subjected him to double jeopardy. We remand this case to the district court with the direction that it issue the writ on all three charges and determine a reasonable time in which to retry Fitzpatrick.