UNITED STATES of America, Plaintiff–Appellee,

v.

Keith SHWAYDER, Michael G. Swan, and Kevin Orton, Defendants– Appellants.

Nos. 01–10156, 01–10176 and 01–10186.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 16, 2002.

Filed Dec. 5, 2002.

---

John D. Cline, Freedman, Boyd, Daniels, Hollander, Goldberg & Cline P.A.,

**1112**

Albuquerque, NM; Alan Ellis and Karen Landau, Law Offices of Alan Ellis, Sausalito, CA; Douglass A. Mitchell, Dickerson, Dickerson, Consul & Pocker, Las Vegas, NV, for the defendants-appellants.

J. Gregory Damm and Bruce M. Bettigole, Office of the United States Attorney, Las Vegas, NV, and Kirby A. Heller, Appellate Section, Criminal Division, United States Department of Justice, Washington, DC, for the plaintiff-appellee.

Before HUG and BERZON, Circuit Judges, and LASNIK,* District Judge.

## OPINION

BERZON, Circuit Judge:

Keith Shwayder appeals his convictions for racketeering, RICO conspiracy, conspiracy, securities fraud, wire fraud, and money laundering. He argues that he was deprived of his Sixth Amendment right to effective assistance of counsel because his trial counsel had an actual conflict of interest. Although there was such a conflict, Shwayder has not shown that the conflict adversely affected his counsel's representation.

Shwayder further contends that the prosecution asked his character witnesses guilt-assuming hypothetical questions, in violation of his right to due process. The prosecution's use of guilt-assuming hypothetical questions did constitute error, but this error did not affect Shwayder's substantial rights.

Lastly, Shwayder contends that the factual findings used to increase his base offense level for sentencing purposes should have been made by a jury rather than a judge. The law of this circuit is to the contrary.

Because none of these contentions warrants reversal or remand, we affirm Shwayder's convictions and sentence.[1]

## I. BACKGROUND

### A. *The Conspiracy*

Keith Shwayder was president of Teletek, Inc. ("Teletek"), a telephone sales and installation company listed on the NASDAQ stock exchange. Michael G. Swan contacted Shwayder about the possibility of merging Teletek with United Payphone ("UPAY"), a telephone company in which Swan had a controlling interest.

UPAY, traded on bulletin boards rather than a major stock exchange, was heavily in debt and in need of cash. Unlike bulletin-board-traded stock, NASDAQ-listed stock can be traded in large volumes, thereby generating substantial amounts of cash. Therefore Swan decided to pursue a merger with Teletek, a NASDAQ-listed company.

Shwayder agreed to merge Teletek with UPAY. In February 1992, Swan purchased a controlling interest in Teletek and became the chief executive and chairman of the Board of Directors of Teletek. Once he acquired Teletek, Swan entered into agreements with stockbrokers. Some of the agreements promised the stockbrokers cash payments by Teletek in exchange for promotion of UPAY and Teletek stock to their customers. Teletek would also issue

---

* The Honorable Robert S. Lasnik, United States District Judge for the Western District of Washington, sitting by designation.

1. We are simultaneously filing a memorandum disposition addressing matters concerning co-defendants Orton and Swan in Nos. 01–10176 and 01–10186.

its stock to the stockbrokers under Securities and Exchange Commission (SEC) Regulation S–8, which permits stock to be issued in exchange for consulting services. None of the stockbrokers receiving such stock provided consulting services for Teletek or UPAY. Instead, they principally issued and promoted Teletek stock, thereby generating cash for the companies through increased stock sales that in turn drove up the price of Teletek's shares. Shwayder signed several documents filed with the SEC representing that these stock issues were for consulting services.

Shwayder remained involved with Teletek for about nine months after the merger. He then resigned. At about the time that Shwayder left Teletek, Teletek issued stock to Prinfan, a company owned by Shwayder's business associate, Neil Feinstein. According to Shwayder: Feinstein received the stock in exchange for consulting services. Feinstein then loaned money back to Shwayder. Shwayder repaid the loan in part by providing consulting services to Prinfan, and Feinstein forgave the rest. The government's theory was that the consulting agreement with Feinstein, the stock issued to Prinfan, and the loan to Shwayder were all sham transactions designed to pay Shwayder substantial sums to leave Teletek.

For several years after Shwayder left Teletek, Swan continued paying bribes to induce brokers to sell Teletek stock. Ultimately, the price of Teletek collapsed and the company went bankrupt. Several investors were left with worthless stock or sold their Teletek stock at a significant loss.

Shwayder was named in a 110–count indictment charging him with racketeering in violation of 18 U.S.C. § 1962(c); RICO conspiracy in violation of 18 U.S.C. § 1962(d); conspiracy in violation of 18 U.S.C. § 371; securities fraud in violation of 15 U.S.C. §§ 78j(b), 78ff(a); wire fraud

in violation of 18 U.S.C. § 1343; and money laundering in violation of 18 U.S.C. §§ 1956, 1957. The alleged racketeering conspiracy involved the commission of various illegal acts, including: bribing stock promoters and stock brokers to sell shares of UPAY and Teletek; fraudulently issuing shares of stock to entities controlled by the defendants; participating in insider trading; manipulating the volume and price of stocks; filing false financial reports and statements and other public documents; and concealing and laundering the illegal proceeds from the scheme.

**B.** *Retention of Counsel*

Before the indictment issued in November 1996, Shwayder sought representation from an attorney, John Schlie, regarding any legal proceedings that might arise out of Teletek's activities. When Shwayder asked Schlie to represent him, Schlie initially declined because of his prior representation of Swan.

Schlie had represented Swan from October 1994 to May 1995. The representation concerned a grand jury investigation of bribes Swan allegedly paid to stockbrokers who agreed to promote UPAY and Teletek stock. During the course of his representation Schlie had confidential communications with Swan regarding certain bribes that became part of the conduct charged in this case. In response to letters accusing Swan of bribing brokers, Schlie conducted an investigation on Swan's behalf, met with a prosecutor to discuss a grand jury investigation regarding the bribes, and learned of allegations that Swan had committed perjury during a SEC deposition by lying about bribing brokers. Swan repeatedly told Schlie that he had never bribed brokers.

Following Schlie's initial refusal, Shwayder persisted in attempting to retain him. Schlie ultimately agreed to represent Shwayder, after he obtained Swan's per-

mission and both Swan and Shwayder signed waivers. Shwayder's waiver states: "Neither [Schlie] nor I am aware of any real conflicts of interest between my defense and that of Michael Swan." Swan's waiver states that Swan "did not, however, authorize the law firm to disclose any information subject to[his] attorney-client privilege."

## C. *The Trial*

The joint trial of Shwayder, Swan and Kevin Orton, Teletek's accountant, lasted two months. The three defendants initially entered into a joint defense agreement. Almost one month into the trial, Swan pleaded guilty and agreed to testify for the prosecution. During trial, neither Schlie nor the prosecution informed the court of the conflict potentially posed by Schlie's prior representation of Swan.

Swan testified that he and other individuals had told Shwayder on several occasions of their bribery scheme. Swan also testified that Shwayder was present at meetings where agreements were made to bribe stockbrokers to sell Teletek stock and that Shwayder controlled a bank account that received illicit proceeds from the scheme.

Schlie cross-examined Swan on Shwayder's behalf. (Orton's counsel had already cross-examined Swan and vigorously attacked his credibility.) During cross-examination, Swan assented to Schlie's statement that Swan was somewhat of "a lone ranger," because he made deals and talked to people without communicating that information to others in the organization. Swan also agreed that "in a lot of circumstances" he would not tell Shwayder what was going on and admitted that he had told Shwayder that many of the issuances of stock were for legitimate purposes when they were not.

Schlie also asked questions designed to elicit the information that Swan was testifying as part of his plea agreement with the government; that his decision to plead guilty had reduced his sentence significantly; and that the government could later make a motion for downward departure to reduce his sentence further.

The government called 44 witnesses, including several of the stockbrokers who participated in the bribery scheme. Shwayder's former secretary, Annette Rosenberg, testified and implicated Shwayder in the scheme. The government also introduced a tape recording of a conversation in which Shwayder asked another participant how much of the money "he got to keep," and told that person how to explain a large payment received from Teletek.

Shwayder testified in his own defense. He maintained that he did not know the illegal purpose behind the acts in which he participated. To support this contention, Shwayder presented two character witnesses, both of whom gave positive opinions of Shwayder's honesty.

On cross-examination, the government questioned each of these witnesses regarding whether his opinion would change if Shwayder had committed certain acts alleged in the indictment. Shwayder's counsel never objected to the form of the questions. Character witness Jack Shaffer, a former director of Teletek, steadfastly answered these guilt-assuming questions with statements such as: "That does not match up with the man I know," "I don't think he would do something like that so I don't ... think it applies," "I can't believe that that's true," and "I just don't believe Mr. Shwayder would do anything like that." [2] The government asked similar questions of Shwayder's other character

2. For example:

Q: Would it change your mind about

witness, Dr. James Sorensen, a business associate that Shwayder had known for 15 years.[3]

In his closing argument, Schlie recalled Swan's testimony as follows:

> Who signs all the documents filed with the [SEC]? Michael Swan. Who makes all the decisions on funding with all these brokers? Michael Swan....

> whether Mr. Shwayder is an honest person if he lied in a certificate claiming he wasn't working with anyone to get his Teletek stock sold when, in fact, he was working with all kinds of people to get his Teletek stock sold?
> A: I don't believe he'd do that.
> Q: But if he did would it change your opinion of him?
> A: I believe anybody that lies ... if it's a serious thing then I think it's ... something to a person's detrimental character.
>
> ...
>
> Q: Would it change your opinion if he signed off on official filings with the [SEC], documents that are intended for public investors to be able to view, about issuing millions of shares of Teletek stock for imaginary consulting? ...
> A: I don't know anything about those kind of things, these are all conjectures kind of things. I don't think I'd change my mind about Mr. Shwayder because from what I know of him I believe him to be a totally honest person and ethical and above board.

3. For example:

> Q: Now, would it change your opinion ... if he lied about whether he was working in concert with other people to sell his Teletek stock, claiming that he wasn't working in concert with them, in fact, he was working with all sorts of people to get that stock sold? ...
> A: Well, I think I would need to know more about the situation, have a better understanding of the facts.... Well, if those are established facts, and I don't know that that's the case. I mean it's a hypothetical.
> Q: Would it change your opinion ... if he signed off on official filings with the [SEC] to issue millions of shares of

> And I asked him, "You would tell Mr. Shwayder that these things were for promotional services, consulting services, investment banking agreements?" "That's right." That's what he was telling Mr.

Shwayder and he covered it with agreements that made the transactions, every one of them, look legitimate. There

> stock for imaginary consulting services? ...
> A: Well, I would want to know more about how that came about, I mean whether or not he was fully informed. I mean it sounds like a complex transaction and if you have any delegation of duties or you're working with other people on something, people can put something in front of you and assert that it's something and you sign it and it turns out not to be what you thought it was.
> Q: Well, if Mr. Shwayder knew that the entities that were on this official form that he was signing hadn't really provided the consulting services, I want you to assume that much, and he goes right ahead and signs it that they had been, would that change your opinion ... ?
> A: I would need to know more about the situation.
>
> ...
>
> Q: Well, if he lied about the reason why the stock was to be issued and worked with the public company to have official documents filed with the SEC claiming falsely that Prinfan was providing consulting services for this stock, would that be enough information for you to decide whether to change your opinion?
> A: Well, if Mr. Shwayder fully understood that, I mean, again we're back to a factual situation where—was he knowledgeable of all this, did he know all of these things?
>
> ...
>
> Q: [I]f this jury convicts Mr. Shwayder of all of these crimes that he's charged with, will that change your opinion about his character?
> A: It would cause me to want to look more carefully at the evidence that they reviewed that led to that conviction.

isn't one shred of evidence in his testimony or in this record that he told Keith Shwayder what was going on. . . .

. . . Keith Shwayder's a 60 year old man who never had legal problems before this. For nine months of his life he got involved with Michael Swan trying to do a business deal. Michael Swan abused that situation. Michael Swan lied to his wife. He lied to his lawyer. He lied to his friends. He lied to his business associates. He lied to Keith Shwayder. He lied to everyone. That's just the state of the evidence.

The jury convicted Shwayder of conspiracy, racketeering conspiracy, racketeering, money laundering, and some of the securities fraud and wire fraud counts. He was acquitted of two counts of wire fraud and one count of securities fraud.

### D. *Shwayder's Motion for A New Trial*

After the trial, Shwayder retained new counsel and filed a motion for a new trial. The motion revealed Schlie's prior representation of Swan and contended that Schlie's presentation of Shwayder's case at trial was affected by an actual conflict. The district court ordered an evidentiary hearing on the motion.

At the hearing, Schlie testified that Swan had authorized him to use Swan's confidences in his representation of Shwayder, so long as they were not used to assist the government's case against Swan. Swan testified to the contrary—that he did not give Schlie such authority but rather insisted that Schlie preserve his attorney-client confidentiality. Schlie's notes of a conversation among him, Swan, and Swan's new attorney state that he was permitted to talk to Shwayder as long as he did not breach Swan's attorney/client privilege. Swan's waiver form states, consistent with those notes, that it does "not authorize the law firm to disclose any in-

formation subject to my attorney-client privilege."

The decision to enter into a joint defense agreement, Schlie testified, was not affected by his prior representation of Swan. Rather, it was a result of Schlie's belief, based in part on information gathered from mock jurors, that a finger-pointing strategy would not be successful in this case and that the best chance of acquittal for Shwayder and Orton was to acquit Swan. Schlie also testified that, in his view, nothing had changed regarding the conflict of interest issues once Swan pleaded guilty.

After the evidentiary hearing, the district court denied the motion for a new trial, stating:

. . . . Shwayder has failed to demonstrate that Schlie's brief representation of co-Defendant Swan and subsequent representation of him created an actual conflict of interest. Indeed, the testimony of John Schlie, which the court finds entirely credible, indicates there was really nothing Schlie failed to do or did in representing Shwayder which was based on or effected [*sic* ] by his prior representation of Swan. In short, the Court finds that the evidence presented failed to reveal that any theoretical conflict caused an adverse effect on Schlie's representation of Shwayder so as to warrant a new trial.

The district court granted Shwayder's motion to reconsider its ruling on the new trial motion so as to allow Shwayder to present testimony from Nathan Drage, the attorney who participated in conversations with Schlie and Swan regarding the conflict waiver. After hearing Drage's testimony, the district court again denied the motion, stating:

Notwithstanding Defendant Shwayder's argument that the testimony of Co–De-

fendant Swan and Drage regarding the 1996 telephone conversation should be credited because they testified against their self interest, the Court maintains the view that the testimony of John Schlie regarding the 1996 conversation is the most credible version of the events occurring at that time. The Court's view of Mr. Schlie's credibility is reinforced by the opportunity the Court has had to interact with Mr. Schlie in the course of pretrial and trial proceedings related to this case.

## II. DISCUSSION

### A. *Shwayder's Right to Conflict–Free Counsel*

Shwayder argues that his trial counsel's former representation of Swan created an actual conflict of interest. Schlie's continuing duties of loyalty and confidentiality to his former client Swan, Shwayder further maintains, adversely affected Schlie's representation by preventing Schlie from (i) pointing the finger at Swan as a culprit who used Shwayder for his own nefarious purposes without informing him of the illegal scheme; and (ii) from attacking Swan's credibility during cross-examination. We conclude that although there was indeed an actual conflict of interest, it did not adversely affect Schlie's representation.

■ The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel at trial. To establish a violation of this right, a defendant must ordinarily establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). However, "a defendant who shows that a conflict of interest *actually affected the adequacy of his representation* need not demon-

strate prejudice in order to obtain relief." *Mickens v. Taylor,* 535 U.S. 162, 122 S.Ct. 1237, 1243, 152 L.Ed.2d 291 (2002) (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 349–50, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)).

### 1. *Waiver of Conflict*

■ We note at the outset that Shwayder's waiver of his conflict of interest was not valid. The waiver document stated that there was no conflict of interest, so it can hardly be read as waiving one. Also, the document was signed before the indictment was issued and a few years before trial, so it could not have taken into account the actual scope of the case as it proceeded.

■ Furthermore, "[f]or a waiver to be knowing and intelligent, the defendant must have been sufficiently informed of the consequences of his choice." *Lockhart v. Terhune,* 250 F.3d 1223, 1232 (9th Cir. 2001) (internal quotation marks and citation omitted); *see also id.* (citing *United States v. Agosto,* 675 F.2d 965, 976–77 (8th Cir.1982) (holding waiver invalid when the defendant was informed of a possible conflict due to attorney's prior representation of co-defendant and told that a conflict may arise from prior confidential communications but not told that a valid conflict may result from continued loyalty to co-defendant)). Schlie never raised the conflict issue with Shwayder or the court after Swan's guilty plea altered the potential risks posed by Schlie's representation of Shwayder. In fact, Schlie testified that he never felt that there was a conflict issue that he needed to discuss with his client.

Because Shwayder was never adequately informed of the significance of the various conflicts that might arise from Schlie's former representation of Swan, Shwayder did not waive his right to conflict-free counsel. We therefore turn to the question whether there was an actual conflict

and, if so, it affected Schlie's representation of Shwayder.

### 2. *Actual Conflict*

 "In successive representation, conflicts of interest may arise if the cases are substantially related or if the attorney reveals privileged communications of the former client or otherwise divides his loyalties." *Fitzpatrick v. McCormick,* 869 F.2d 1247, 1252 (9th Cir.1989) (internal quotation marks and citation omitted). One of the risks created by successive representation is "that the attorney who has obtained privileged information from the former client may fail to conduct a rigorous cross-examination [of that client] for fear of misusing that confidential information." *Id.* The potential for conflict is particularly acute when the two clients are co-defendants who allege different levels of culpability. *Id.*

Applying these standards, we conclude that there was an actual conflict of interest. Schlie represented Swan in matters that directly concerned bribing stockbrokers to sell Teletek stock. From the beginning of this litigation, Shwayder had an interest in laying the blame on Swan and portraying himself as the victim. The conflict between the two alleged co-conspirators became greater when Swan agreed to plead guilty and testify against Shwayder for the prosecution. *See United States v. Malpiedi,* 62 F.3d 465, 469 (2d Cir.1995). By shifting the blame to Swan through cross-examination concerning matters on which he had previously represented him, Schlie could have breached his duty of loyalty to Swan—or at least could have

feared that he would appear to do so and therefore avoided certain areas of inquiry.[4]

### 3. *Adverse Effect on Schlie's Representation of Shwayder*

 To show that an actual conflict had an adverse effect, the defendant must establish that it "affected the counsel's performance, as opposed to a mere theoretical division of loyalties." *Mickens,* 122 S.Ct. at 1243. The showing must be that "counsel was influenced in his basic strategic decisions by the interests [of the former client]," as where the conflict "prevents an attorney ... from arguing the relative involvement and culpability of his clients in order to minimize the culpability of one by emphasizing the other," *Wheat v. United States,* 486 U.S. 153, 160, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988).

Shwayder insists that there were such effects, including Schlie's failure to: blame Swan in the opening statement; establish on cross-examination that Swan was lying in order to procure a substantial assistance downward departure in sentencing; attack Swan's credibility vigorously on cross-examination; question Swan about lying to Schlie by telling him that the bribes were actually compensation for investment banking services; and impeach Swan's credibility with the lies that Swan had told Schlie about paying brokers to retail Teletek stock. The district court concluded, however, that Schlie credibly testified that his representation was not affected by the conflict. The court denied a new trial primarily on that ground.

 Ordinarily, the district court's determinations of credibility, on conflict

---

**4.** The government contends that there was no actual conflict of interest because "[t]here was unquestionably no further potential harm to Swan from any cross-examination which Schlie might have pursued." This assertion is not true. Swan had yet to be sentenced.

Effective testimony could have affected his sentence through a substantial assistance departure. Conversely, if Swan lied on the stand, an obstruction of justice enhancement was a possibility.

issues as on any other, should not be second-guessed. In particular, "[t]he district judge, who presumably is familiar with the legal talents and character of the lawyers who practice at the local bar and who saw and heard the witness testify, is in a far better position than we are to evaluate a charge of [conflict of interest]." *Burger v. Kemp*, 483 U.S. 776, 785, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987).[5] Yet, as we have had occasion to note, "[t]he existence of a conflict of interest cannot be governed solely by the perceptions of the attorney; rather, the court itself must examine the record to discern whether the attorney's behavior seems to have been influenced by the suggested conflict." *Sanders v. Ratelle*, 21 F.3d 1446, 1452 (9th Cir.1994). Human self-perception regarding one's own motives for particular actions in difficult circumstances is too faulty to be relied upon, even if the individual reporting is telling the truth as he perceives it. *See Malpiedi*, 62 F.3d at 470 ("after-the-fact testimony by a lawyer who was precluded by a conflict of interest from pursuing a strategy or tactic is not helpful. Even the most candid persons may be able to convince themselves that they actually would not have used that strategy or tactic anyway, when the alternative is a confession of ineffective assistance resulting from ethical limitations.") Legal and judicial ethics rules so assume, banning lawyers and judges from taking on cases in certain conflict situations even if they are certain that the objective conflict will have no influence on them and are prepared to take every precaution to preclude such influence.

Nevertheless, evidence in the record independent of Schlie's testimony at the evidentiary hearing confirms that Schlie's conflict did not adversely affect his representation of Shwayder. Schlie carried out precisely the type of representation Shwayder maintained that his trial attorney could not and did not provide because of his conflict.

In his opening statement, Schlie emphasized that the trial would come down to knowledge and that the jurors would have to make their decisions on each individual defendant independently. Once Swan pleaded guilty, Schlie attempted to point the finger at Swan and to attack his credibility. Schlie cross-examined government witnesses and examined defense witnesses with questions directed at establishing that Swan alone was to blame. He asked about Swan's lies to Shwayder. While cross-examining Swan, Schlie elicited testimony that Swan never told Shwayder that he was paying off stockbrokers. Schlie also assured that the jury was aware that Swan would receive a much lower sentence by pleading guilty and that the government could further reduce his sentence.

Moreover, even if he was conscientious about preserving confidences, Schlie was not in fact ethically restricted from questioning Swan about most of the subjects on which they had prior confidential communications. Virtually all of that information was available, independent of any lawyer/client confidences, through the indictment, the trial testimony, and the evidence provided to the defense on discovery.

There was one fact not available from an independent source—that Swan had lied to

---

**5.** At least some of Schlie's testimony—that concerning the actual scope of the waiver—was contradicted by his own notes, Swan's testimony and that of his attorney, Drage, and the waiver form itself. The district court did not note these contradictions. As we have determined that there was an actual conflict whatever Schlie may have believed and do not rely on Schlie's own perception regarding that conflict in evaluating its impact, we need not decide whether the district court's credibility determination is clearly erroneous.

Schlie during his prior representation. It is difficult, however, to characterize Schlie's failure to mention this fact as an adverse effect caused by his former representation of Swan. Schlie would never have known that Swan lied to his former lawyer if he had not been that lawyer. As no other lawyer could have cross-examined Swan on that point, Schlie's representation was no different as to that point than it would have been without the conflict.

In any event, the omission regarding Swan's lies to Schlie had at most a negligible effect. Schlie emphasized in closing that Swan had lied to everyone else, specifically mentioning "his lawyer," as well as Shwayder.

We conclude that although Schlie had an actual conflict of interest, his former representation of Swan did not adversely affect his representation of Shwayder. We therefore affirm the district court's denial of Shwayder's motion for a new trial.

## B. *Use of Guilt–Assuming Hypotheticals to Cross–Examine Character Witnesses*

■■■ Although he did not raise the point in the district court, Shwayder now argues that the prosecution's use of guilt-assuming hypotheticals during cross-examination of Shwayder's character witnesses constitutes reversible error. We review for plain error. *United States v. Antonakeas*, 255 F.3d 714, 727 (9th Cir.2001). Under the plain error standard, relief is not warranted unless there has been "(1) error, (2) that was clear or obvious, (3) that affected substantial rights, and (4) that seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Vences*, 169 F.3d 611, 613 (9th Cir.1999) (citation omitted).

**6.** We have noted the issue but found it unnecessary to decide. *United States v. Velasquez,*

### 1. *Error*

Federal Rule of Evidence 405(a) allows the government to cross-examine character witnesses regarding their knowledge of specific instances of the defendant's misconduct. Fed.R.Evid. 405(a) ("In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.") Such cross-examination helps the jury evaluate the quality of the character testimony.

■■■ We have not yet addressed whether it is error for the prosecution to ask questions on cross-examination that assume the defendant's guilt of the precise acts for which he is on trial.[6] The reasons for why it is error were cogently stated by the Fourth Circuit:

> Character testimony in a criminal trial is admitted pursuant to Rule 405(a) of the Federal Rules of Evidence only as it may bear on the issue of guilt. Although an argument can be made that guilt-assuming hypothetical questions may be probative of the credibility of a non-expert witness, an opinion elicited by a question that assumes that the defendant is guilty can have only negligible probative value as it bears on the central issue of guilt.
>
> . . .
>
> And, in addition to a proper application of the rules of evidence, adherence to a basic concept of our justice system, the presumption of innocence, is not served by this line of questioning.

980 F.2d 1275, 1277 (9th Cir.1992).

*United States v. Mason*, 993 F.2d 406, 408–09 (4th Cir.1993) (footnote omitted). Following almost every other circuit that has addressed the question,[7] we now hold that the use of guilt assuming hypotheticals undermines the presumption of innocence and thus violates a defendant's right to due process. The prosecution's use of guilt-assuming hypothetical questions on cross-examination of Shwayder's character witnesses therefore constituted error.

To be plain, however, an error must have been clear or obvious. *United States v. Turman*, 122 F.3d 1167, 1170 (9th Cir. 1997). Neither the Supreme Court nor the Ninth Circuit has previously addressed the guilt-assuming hypothetical question. The government contends that the error therefore was not plain.

It is, indeed, not clear that an error can be deemed "plain" in such circumstances. *See United States v. Thompson*, 82 F.3d 849, 855 (9th Cir.1996) ("[W]e do not see how an error can be plain error when the Supreme Court and this court have not spoken on the subject, and the authority in other circuits is split." (internal quotation marks and citation omitted)). We need not decide, however, whether the near-unanimity among the other circuits distinguishes this case from *Thompson*. There

are other reasons that there was no plain error—the error did not affect Shwayder's substantial rights or "seriously affect[ ] the fairness, integrity, or public reputation of the judicial proceedings." *Vences*, 169 F.3d at 613.

### 2. *Effect on Substantial Rights*

■ The prosecution's improper use of guilt-assuming hypothetical questions did not affect Shwayder's substantial rights. Both Shwayder's character witnesses declined to answer many of the hypothetical questions. Also, each of the character witnesses, when he did answer guilt-assuming questions, did so with statements expressing his disbelief that Shwayder would ever be capable of knowingly committing such acts, thereby bolstering rather than detracting from his positive opinion of the defendant's honesty.

In a case where similar answers were provided by character witnesses, the Eleventh Circuit stated:

The harm in allowing the use of this type of improper hypothetical lies in the effect of having the defendant's own character witness assume that the defendant is guilty. Here, the witness essentially refused to accept that assumption. The government's improper

---

7. Several other circuits have forbidden use of such questions on due process and presumption of innocence grounds. *See United States v. Guzman*, 167 F.3d 1350, 1352 (11th Cir. 1999) ("The government may not ... pose hypothetical questions that assume the guilt of the accused in the very case at bar."); *United States v. Oshatz*, 912 F.2d 534, 539 (2d Cir.1990) ("The jury might infer from the judge's permission to ask a guilt-based hypothetical question that the prosecutor has evidence of guilt beyond the evidence in the record."); *United States v. McGuire*, 744 F.2d 1197, 1204 (6th Cir.1984) ("It would be error to allow the prosecution to ask the character witness to assume defendant's guilt of the offenses for which he is then on trial."); *United States v. Williams*, 738 F.2d 172, 177

(7th Cir.1984) (Guilt-assuming hypotheticals "allow[ ] the prosecution to foist its theory of the case repeatedly on the jury and to force an unsuspecting witness to speculate on the effect of a possible conviction."); *United States v. Candelaria–Gonzalez*, 547 F.2d 291, 294 (5th Cir.1977) ("These hypothetical questions [strike] at the very heart of the presumption of innocence which is fundamental to Anglo–Saxon concepts of fair trial.") Only the District of Columbia Circuit has held that witnesses testifying about their opinion of a defendant's character may be asked guilt-assuming hypothetical questions on cross-examination, but the court distinguished reputation witnesses, for whom such questions may be improper. *United States v. White*, 887 F.2d 267, 274–75 (D.C.Cir.1989).

question backfired and, arguably, Guzman's case was strengthened by [the] response. It strains credulity to maintain that, in such context, the question attenuated the presumption of innocence to which Guzman was entitled. *Guzman,* 167 F.3d at 1353–54. The *Guzman* court went on to find it "clear beyond a reasonable doubt that the jury would have returned the same verdict if the question had not been asked." *Id.* at 1354. Similarly, here—and even more clearly, as we are applying the plain error standard—the prosecution's use of guilt-assuming hypotheticals did not affect Shwayder's substantial rights. The witnesses' answers negated any harm that may have been caused by the government's use of these questions. As a result, Shwayder has not established that the jury's verdict would have been different if the questions had not been asked.

■■■ Although Shwayder has not met the third prong of the plain error standard, we note that the error in this case also did not "seriously affect the fairness, integrity, or public reputation of the proceedings." Shwayder's attorney, having presumably prepared the character witnesses, may well have anticipated that they would answer the guilt-assuming hypotheticals in a manner favorable to the defense. His failure to object to the government's repeated questions may therefore have been a deliberate, tactical decision. Where such tactical behavior is likely, we should take great care before exercising our discretion to reverse for plain error.

We therefore hold that asking character witnesses hypothetical questions that assume the defendant's guilt during cross-examination is error. Nevertheless, the error did not affect Shwayder's substantial rights and thus does not warrant reversal under the plain error standard.

**C. *Sentencing***

■■■ In sentencing Shwayder, the district court enhanced the base offense levels under the United States Sentencing Guidelines for some of his convictions, such as those for obstruction of justice, U.S.S.G. § 3C1.1, and money laundering, U.S.S.G. § 2S1.2. Shwayder argues that the district court erred under *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), by making factual findings used to increase his base offense levels, rather than referring the factual questions to the jury. We reject this argument because *"Apprendi* does not alter the authority of the judge to sentence *within* the statutory range provided by Congress." *United States v. Buckland,* 289 F.3d 558, 570 (9th Cir.2002) (en banc); *see also United States v. Johansson,* 249 F.3d 848, 861–62 (9th Cir.2001).

### III. CONCLUSION

Shwayder's trial counsel had an actual conflict of interest because of his prior representation of Shwayder's co-defendant, but the conflict did not adversely affect the representation Shwayder received. Similarly, although the government's use of guilt-assuming hypothetical questions during its cross-examination of Shwayder's character witnesses violated due process, the error does not warrant reversal. Shwayder's sentencing was correctly determined. We therefore affirm Shwayder's convictions and sentence.

AFFIRMED.